Gerald AHEARN, James Dennis, Charles W. Jeep, James Ellison and William James Mitchell, on Behalf of Themselves and Others Similarly Situated, Plaintiffs,

v.

FIBREBOARD CORPORATION and Bethlehem Steel Corporation, Defendants,

Continental Casualty Company, CNA Casualty Company of California, Columbia Casualty Company and Pacific Indemnity Company, Defendant–Intervenors.

Owens–Illinois, Inc. on Behalf of Itself and Others Similarly Situated, Additional Counterclaim Defendant.

Civ. A. No. 6:93cv526.

United States District Court,
E.D. Texas,
Tyler Division.

July 27, 1995.

---

### *MEMORANDUM OPINION*

ROBERT M. PARKER, Circuit Judge.

This action was filed to obtain judicial approval of a class settlement (the "Global Settlement") which, if finally approved, will resolve all future[1] asbestos-related personal injury claims against Fibreboard Corporation ("Fibreboard"), and a longstanding dispute between Fibreboard and two of its insurers, Continental Casualty Company ("Continental") and Pacific Indemnity Company ("Pacific") (Continental and Pacific are sometimes referred to collectively as the "Insurers") regarding the scope and extent of its insurance coverage available to Fibreboard to cover its asbestos liabilities. The agreements now before the Court for approval reflect a settlement among parties who have aggressively asserted and controverted the rights and claims that will be finally compromised and settled if the Court enters a final judgment. The principal parties to this litigation are the following: Gerald Ahearn, James Dennis, Charles W. Jeep, James Ellison and William James Mitchell, the class representatives of the plaintiff and defendant asbestos health claimant classes in this action (the "Global Health Claimant Class," or the "Class"); Fibreboard, which manufactured and distributed asbestos-containing products, principally asbestos insulation, from the 1920s until 1971; Continental, CNA Casualty Company of California and Columbia Casualty Company, which issued general liability policies to Fibreboard; Pacific, which Fibreboard alleges issued it a general liability policy; Owens–Illinois, Inc. ("Owens–Illinois"), the class representative of a defen-

---

1. Throughout this opinion, a "future claim" means a claim by a Global Health Claimant Class member covered by the Global Settlement Agreement. The Global Health Claimant Class essentially consists of all persons having a claim arising out of exposure to asbestos or asbestos-containing products for which Fibreboard may bear legal liability, where that exposure occurred prior to August 27, 1993, and where the claim had not been filed as a lawsuit or settled as of August 27, 1993. The precise class definition is set out in detail in the *Judgment Regarding Class Certification.*

dant class of third-party claimants (the "Global Third–Party Claimant Class"); Bethlehem Steel Corporation ("Bethlehem"), the class representative of a defendant class of certain employers and insurers (the "Longshore Defendant Class"); Esteban Yanez Ortiz, Marion Behee, Paul Cochran, Edee Cochran, Ida Beck, John R. Allgood, Henry Evers and Lester E. Taylor (the "Ortiz Intervenors"), intervenors represented by the law firm of Baron & Budd, who have objected to this settlement; and James Flanagan and David H. Middleton (the "Flanagan Intervenors"), intervenors represented by the Maritime Asbestos Legal Clinic, a Division of the Jaques Admiralty Law Firm, who have objected to this settlement.

## OVERVIEW

This action is the latest installment in the continuing saga of asbestos-related personal injury litigation against Fibreboard. If the Global Settlement is finally approved, it will be the last.

The parties to the Global Settlement (the "Settling Parties") agreed to the settlement because each found the Global Settlement preferable to the alternatives. Under the Global Settlement, Fibreboard will survive with its assets intact; the Global Health Claimant Class members will be better compensated than if Fibreboard were bled dry in the tort system; and the Insurers will rid themselves once and for all of a potentially ruinous liability. The only real loser under the Global Settlement is the asbestos litigation industry—the army of lawyers, consultants, and experts of every stripe—which has historically consumed the lion's share of the funds expended by asbestos defendants and their insurers in dealing with their asbestos liabilities.[2]

Without the Global Settlement, Fibreboard's chances of survival range from fair to nil, depending on the outcome of its insurance dispute. All Global Health Claimant Class Members, but especially those whose

claims mature far in the future and those who were first exposed to Fibreboard's asbestos-containing products after 1959, face a serious risk of receiving little or no compensation from Fibreboard without the settlement.

The prerequisites of Rule 23(a) have been met. Mandatory class treatment is proper under the plain language of Rule 23(b)(1)(B). The only real obstacle the Global Settlement faces is its relative novelty. It remains to be seen whether Rule 23 will finally be determined to be flexible enough to embrace such a case. Put another way, the primary question presented by this case is whether the courts can provide a forum wherein a business plagued with continuing mass tort liability can negotiate a fair and final resolution the problem, or whether the courts' competence is limited to parceling out the corpse in bankruptcy.

## BACKGROUND AND SETTLEMENT NEGOTIATIONS

### A. Asbestos Litigation Generally

Asbestos-related personal injury and wrongful death litigation began in the courts of East Texas in the late 1960s. The first modern-day asbestos-related personal injury case in this country was brought in this Court in 1967 by Claude Tomplait against Fibreboard and other defendants. Through the late 1970s, plaintiffs' counsel around the country crafted theories of liability against the asbestos defendants they had identified. Plaintiffs' counsel conducted discovery, assembled a mass of documents bearing on liability that are now well known to every experienced asbestos judge, and identified the various medical conditions that could be forensically attributed to asbestos exposure. By the mid–1980s, the fundamental legal theories and liability cases against the early defendants, including Fibreboard, had been

---

**2.** The Asbestos Litigation Industry was not without a voice in these proceedings. The Jaques firm, which represents the Flanagan Intervenors, purports to have an inventory of thousands of unfiled claims which allegedly would be affected by approval of the Global Settlement to the detriment of the firm. One of that firm's primary objections to the Global Settlement is that it would limit attorneys' fees to 25% of a claimant's recovery under the Global Settlement rather than a higher contractual contingent fee.

established, and litigation against these companies intensified dramatically.

Facing enormous liabilities and overwhelming defense costs, many defendants ended up in bankruptcy, including a number of companies previously considered to be immune from financial difficulty. *See In re Asbestos Products Liability Litigation*, 771 F.Supp. 415, 420 (J.P.M.L.1991). Beginning in 1982 with Unarco Industries, Inc. and Johns–Manville, Inc. the list of corporate asbestos bankrupts now includes such defendants as Celotex Corporation, Eagle–Picher Industries, Inc., H.K. Porter Company, Inc., Keene Corporation, National Gypsum Company, Forty–Eight Insulations, Inc., and Raymark Industries, Inc.

As asbestos-related personal injury litigation mushroomed in the 1980s, asbestos dockets across the country grew exponentially, and plaintiffs in many jurisdictions began to face substantial delays in having their claims resolved. Transaction costs outpaced compensation to victims. Rand Corporation studies in 1983 through 1985 found that only 37% to 39% of money paid by asbestos defendants actually went to victims, with 61% to 63% consumed by transaction costs. Institute for Civil Justice *Annual Report*, April 1, 1990–March 31, 1991 (RAND).

By 1990, the situation had reached critical proportions. In September 1990, Chief Justice Rehnquist appointed a panel, the Judicial Conference Ad Hoc Committee on Asbestos Litigation ("Asbestos Ad Hoc Committee"), to study asbestos litigation and make recommendations. In November 1990, eight federal district judges with significant asbestos experience sent a letter to the Judicial Panel for Multidistrict Litigation ("MDL Panel"). They urged the MDL Panel to reverse its several prior rulings declining requested MDL transfers, and asked that the MDL Panel consolidate all federal asbestos litigation in a single judicial district. These judges argued that consolidation would, among other things, "facilitate global settlements," and allow the transferee court to "fully explore ... national disposition techniques such as classes and sub-classes under Rule 23."

In March 1991, the Asbestos Ad Hoc Committee issued its report. The report has been described as a "ringing condemnation" of the treatment of asbestos claims in the tort system. *See Georgine v. Amchem Prods.*, 157 F.R.D. 246, 265 (E.D.Pa.1994). The Asbestos Ad Hoc Committee stated: "[T]he [asbestos] situation has reached critical dimensions and is getting worse. What has been a frustrating problem is becoming a disaster of major proportions to both the victims and the producers of asbestos products, which the courts are ill-equipped to meet effectively." *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation* ("Asbestos Ad Hoc Committee Report") at 2 (1991). The Asbestos Ad Hoc Committee also expressed its hope that some alternative dispute resolution mechanism for processing asbestos claims could be fashioned. *Id.* at 14. It concluded that: "The volume and complexity of asbestos cases have resulted in the violation of a basic tenet of American justice and the spirit of the Civil Justice Reform Act of 1990: speedy and inexpensive resolution of cases." *Id.* at 10

On July 29, 1991, the MDL Panel issued an order transferring all federal personal injury asbestos litigation to Judge Weiner of the Eastern District of Pennsylvania for coordinated or consolidated pretrial proceedings. *In re Asbestos Products Liability Litigation*, 771 F.Supp. 415. The MDL Panel voiced its hope that the MDL transfer might foster global settlements of the "asbestos mess," noting that transfer "offer[s] a great opportunity to all participants who sincerely wish to resolve these asbestos matters fairly and with as little unnecessary expense as possible." *Id.* at 424. At the time of the MDL transfer, almost 30,000 asbestos-related personal injury claims were pending in the federal courts, with two times that number pending in the state courts. *Id.* at 416, 421.

After the MDL transfer, Judge Weiner appointed plaintiffs' and defendants' steering committees for the MDL litigation, the members of which included Ronald Motley, of Ness Motley, as one of the co-lead counsel of the Plaintiffs' Steering Committee; Steven Kazan, of the law firm Kazan, McClain, Edises & Simon, as a member of that committee;

and Stephen M. Snyder,[3] counsel for Fibreboard, as a member of the Defendants' Steering Committee. One of the tasks of the steering committee was to attempt to solve the asbestos crisis on a global basis.

Settlement negotiations began between the Plaintiffs' and Defendants' Steering Committees in the MDL litigation. The parties made substantial efforts at global negotiations involving all plaintiffs and all defendants. The primary purpose of the MDL settlement talks was to craft a national settlement that would provide an alternative resolution mechanism for asbestos claims. Judge Weiner encouraged these global settlement negotiations. The talks did not produce a national settlement, but they did bear fruit. Judge Weiner's unrelenting efforts have resulted in many thousands of claims being settled against some but not all defendants, and they served as a springboard for the subsequent negotiations that eventually led to the settlement of this case. Judge Weiner's efforts also greatly aided the negotiations that resulted in a settlement between asbestos victims and defendants who had formed the Center for Claims Resolution ("CCR"), a claims handling facility created in late 1988 in the wake of the dissolution of a similar organization, the Asbestos Claims Facility. *See Georgine,* 157 F.R.D. at 266–67. Fibreboard had a difficult time fitting itself into the MDL-related settlement talks because it had no cash with which to make settlements.

## B. Fibreboard Background

Fibreboard has employed different strategies to defend asbestos injury cases over time. Early on, like most defendants, Fibreboard relied on Manville to bear the brunt of the defense of cases. When Manville declared bankruptcy in 1982, Fibreboard had to rely totally on a then-existing interim agreement under which one of its insurance carriers, Fireman's Fund Insurance Company, provided Fibreboard with a defense of asbestos injury claims and paid indemnity as necessary.

Fibreboard joined the Asbestos Claims Facility ("ACF"), which began operations in 1985. The formation of the ACF was an effort by more than 30 companies that faced asbestos claims, and by some of their insurers, to create a mechanism to resolve asbestos-related claims through unified claims handling and joint representation in asbestos-related personal injury litigation. The ACF was an insurance settlement. Fibreboard settled policy disputes with certain of its insurers—but not with Continental or Pacific—in order to enter the ACF. Producer members of the ACF, including Fibreboard, received a complete defense and indemnity with respect to claims for compensatory damages, even though they may have had gaps in their insurance coverage.

When Fibreboard entered the ACF, it anticipated that defense costs and indemnity levels would be kept within reasonable limits, and filings of cases in which the claimant did not appear to have any significant disease would be minimized. ACF membership overall did not achieve the results Fibreboard desired on liability and case control issues. In fact, ACF membership drew Fibreboard into types of cases and into jurisdictions where it previously had not been sued and Fibreboard became a "national" defendant sued in regions of the country and in segments of asbestos litigation in which it had not faced liability previously. The result was to double Fibreboard's exposure, even though the facts giving rise to that exposure remained unchanged.

When the ACF ceased operations in October 1988, Fibreboard no longer had any right to a defense or payment of indemnity by Fireman's Fund because the limits of that insurance coverage had been exhausted. Fibreboard had no insurance assets except for the proceeds of two settlements with the American Insurance Group of Companies

---

**3.** Mr. Snyder is a partner in the San Francisco law firm Brobeck, Phleger & Harrison. Since the early 1980's, Mr. Snyder's representation has focused on asbestos litigation defense and, in particular, the defense of Fibreboard. Between 1985 and 1988, he represented the members of the Asbestos Claims Facility in northern California, and served on a number of national committees of that organization. Since 1988, he has been Fibreboard's national counsel for defense of asbestos bodily injury cases.

("AIG") and with Home Insurance Company, totaling approximately $100 million, and the coverage provided by policies issued by Continental and Pacific that was disputed by the Insurers in then pending litigation. When it left the ACF, Fibreboard did not have enough cash to pay settlements of asbestos injury cases and Fibreboard's ability to mount a defense was greatly reduced because it had no insurance coverage for defense, it had insufficient funds to pay for defense, and it faced a difficult time putting together a national network of defense counsel in cooperation with other former ACF members who were at odds with one another in the wake of the difficult process of disbanding the ACF.

## C. Fibreboard's Insurance Coverage Dispute

Continental issued a comprehensive general liability policy to Fibreboard commencing in May 1957, which Fibreboard terminated effective March 15, 1959. The policy had no aggregate limit, but had a $1,000,000 per occurrence limit and a $500,000 per claim limit. Pacific was alleged to have issued a similar policy to Fibreboard in May 1956.

Since 1979, Fibreboard has been engaged in litigation with Continental and Pacific as to whether Fibreboard is entitled to be defended and indemnified under those policies with respect to asbestos-related personal injury, wrongful death, and related claims. In the early 1980s, Fibreboard's action against Continental and Pacific was consolidated with other similar actions in California. Fibreboard's insurance coverage litigation, came to be captioned *In re Asbestos Insurance Coverage Cases*, Judicial Council Coordination Proceeding No. 1072 (the "Coverage Case")

The Coverage Case was tried in several phases. The trial was one of the largest and most complex proceedings in the history of American civil jurisprudence, involving numerous insureds and insurers. At stake for Fibreboard and the insurers was the question of whether Fibreboard would be determined to have no further insurance coverage under the Continental and Pacific policies or, in stark contrast, virtually unlimited coverage under those policies.

The trial court determined that any exposure to Fibreboard's asbestos products during the policy period triggered coverage; that once coverage was triggered, the insurer was liable for the full amount of the damages recovered by the claimant, subject to the per occurrence and per claim limits; and that each claim was a separate "occurrence." The court also ruled that insurers could seek equitable contribution from one another, but not from Fibreboard.

The insurers, including Continental and Pacific, appealed the trial court's decision in the Coverage Case, and the appeals were consolidated. Oral argument was conducted in several phases during the Summer of 1993, with the last phase completed on August 27. On November 15, 1993, the California Court of Appeal issued an opinion substantially affirming a number of the principal aspects of the trial court's judgment. However, the Court of Appeal simultaneously granted a joint motion of Fibreboard, Continental and Pacific to sever several insurance coverage issues unique to those parties, and to vacate submission of those issues pending further report to that court on the progress toward obtaining judicial approval of the settlement at bar. Accordingly, the disputes with respect to those severed coverage issues remain unruled upon by the California Court of Appeal, and their outcome thus remains uncertain even at the intermediate appellate level.

There are five issues currently before the California Supreme Court or the California Court of Appeal that have a significant bearing on the ultimate liability of Continental and Pacific to Fibreboard under their primary policies. These issues are commonly referred to as (i) trigger of coverage;[4] (ii)

---

4. The California Supreme Court recently determined that a continuous trigger applies in third-party general liability policies. The court noted the similarity of the trigger issue in the Coverage Case, but deemed it appropriate, given the unique nature of asbestos litigation, that trigger of coverage questions specifically involving asbestos claims be left for decision on an appropriate record in a case in which they are squarely presented. *See Montrose Chemical Corp. of California v. Admiral Ins. Co.*, 10 Cal.4th 645, 676 n.

**512**

scope of coverage; (iii) number of occurrences; (iv) double anchor; and (v) lost policy. Two of these issues—trigger of coverage and scope of coverage—involve both the Continental and Pacific policies. Two issues—number of occurrences and double anchor—involve only the Continental policy. The lost policy issue involves only the Pacific policy. A loss on any one of these issues could substantially impair, if not totally eliminate, Fibreboard's ability to pay future claims. Two expert witnesses, former California Supreme Court Justice Marcus M. Kaufman and Yale University Law Professor George Priest, testified at the fairness hearing with respect to the issue of the risk—viewed both as of August 27, 1993 and today—that Fibreboard would lose the Coverage Case pending in the California appellate courts. Based on California law and the concerns and propensities of the California Supreme Court, however, it was the opinion of both Justice Kaufman and Professor Priest that as of August 27, 1993, there was a significant risk to Fibreboard that the California Supreme Court would render decisions on one or more of the coverage issues that would have the effect of either eliminating or substantially reducing further indemnity obligations by Continental and Pacific to Fibreboard for asbestos-related personal injury claims. It was also their opinion that the same risk exists today. No objector proffered any witness, testimony or evidence to contradict or impeach in any way the conclusions provided by Justice Kaufman and Professor Priest.

### D. Fibreboard and the Insurers

Following the dissolution of the ACF, Fibreboard found itself with large potential asbestos liabilities, about $100 million in cash from settlements of its AIG and Home Insurance policies, and the disputed Continental and Pacific policies. Fibreboard approached the asbestos Plaintiff's bar and explained its situation. The "Structured Settlement Program" ("SSP") was the result. Under the SSP, Fibreboard agreed to settle pre–1959 claims for 40% cash, with the remainder to be paid on September 1, 1993, which deadline could be extended if the Coverage Case was

not by then resolved, until September 1, 1996. Fibreboard also agreed to conserve its corporate assets, and it agreed that if it lost the Coverage Case, all of the companies assets would be turned over to the plaintiffs. The SSP was offered nationwide, and was generally accepted by plaintiffs' counsel, but higher settlement values were demanded to compensate for the risk that the deferred portion of the settlement would never be paid if Fibreboard lost the Coverage Case.

In December 1988, Fibreboard and Continental entered into what became known as the "Interim Agreement." Continental agreed to fund the 40% cash portion of SSP settlements, which amount was to be reimbursed if Continental won the Coverage Case, Continental agreed to fund Fibreboard's defense, up to annual limits or "caps" of $25 million to $29 million per year, and Continental and Fibreboard agreed to cooperate in the management of pre–1959 claims.

The SSP did not solve Fibreboard's settlement problems. Many plaintiffs going to trial against other defendants often took Fibreboard to trial as well rather than attempt to deal with credit and set-off problems created by the SSP. As a result, Fibreboard became a defendant in a number of large consolidated trials which generated substantial defense costs for Fibreboard. Furthermore, Fibreboard's attempts to bring settlement values back to pre-ACF levels proved costly. In 1988 and 1989, Fibreboard's defense costs were almost twice the value of its negotiated settlements. In 1990, defense costs were $52 million, as compared to the $45 million nominal value in negotiated settlements. By June 1990, Fibreboard reached its annual defense cap under the Interim Agreement, and Continental therefore declined to pay Fibreboard's defense costs incurred thereafter in 1990.

In the course of negotiations to have the defense caps lifted, Fibreboard proposed in late 1990 to Continental and Pacific that the parties negotiate a complete settlement of the policies. Continental declined the proposal. Fibreboard and Pacific pursued the negotiations.

16, 42 Cal.Rptr.2d 324, 341 n. 16, 897 P.2d 1, 18 n. 16 (1995).

Because Fibreboard had no insurance coverage for post–1959 claims, and because all claims covered under the Pacific policy were also covered under the Continental policy, Fibreboard entered into separate settlement negotiations with Pacific beginning in 1990 and culminating 1992. Under the resulting agreement (the "Pacific II Agreement"), Pacific would pay Fibreboard a maximum of $360 million to cover post–1959 claims, the final amount depending on the outcome of the coverage litigation and Fibreboard obtaining an order determining that Continental would have no further rights against Pacific for any asbestos-related defense or indemnity.

By 1991, Fibreboard was feeling intense pressure to initiate a new settlement program. It was facing major consolidated trials in Texas, Mississippi and Baltimore, and it had exhausted its defense monies under the Interim Agreement's defense caps. In order to shift some of the pressure to Continental, Fibreboard initiated its assignment settlement program. Under that program, Fibreboard paid no cash for pre–1959 claims, but assigned its rights to the proceeds under the Continental policy, together with any bad faith claims. Fibreboard agreed to preserve its net worth and corporate assets, and agreed that if it lost the Coverage Case, it would be responsible to pay the entire settlement amounts. Under the assignment settlement program, Fibreboard typically settled a law firm's entire inventory of cases, with a settlement average of over $11,400 per case, more than twice the $5,400 average under the 40% cash SSP.

Continental objected that the assignment settlements breached the Interim Agreement provisions calling for joint management of cases and claim-by-claim evaluation of cases, that the settlements violated policy provisions prohibiting assignment of policy rights, and that the settlement amounts were inflated, and that the pre–1959 claims were assigned a disproportionately high share of the gross settlement amount in each office-wide settlement agreement. Fibreboard filed a number of lawsuits to test whether it's assignments were valid, and in June 1992, Fibreboard was granted summary adjudication in the Superior Court in Alameda County, California in a case known as *Andrus v. Fibreboard Corp.* The California Court of Appeal summarily rejected Continental's Writ of Mandate, and judgment in *Andrus* was entered in Fibreboard's favor in September 1992.[5] In July 1992, Continental wrote to Fibreboard and stated that it would provide a defense notwithstanding the defense caps in the interim agreement. Fibreboard determined that it would continue the assignment settlement program as long as Continental continued to reserve its coverage position.

### E. Global Settlement Negotiations

In 1990, the Federal Judicial Center convened a conference of judges, academics and counsel to address the continuing issues related to asbestos litigation. In the wake of the 1990 conference, members of the asbestos bar and the judiciary took preliminary steps toward national action on the asbestos problem. A number of federal judges organized to explore class action treatment of the problem. In July 1990, some members of the asbestos plaintiffs' bar filed a class action in this Court pursuant to Fed.R.Civ.P. 23(b)(1)(B), *Linscomb v. Pittsburgh Corning Corp., et al.,* Civil Action No. 1:90cv5000 (E.D.Tex.). The action was commenced on behalf of all persons (present and future) with asbestos-related personal injury claims. Many of the major asbestos defendants were sued in *Linscomb,* including Fibreboard. Preliminary proceedings were conducted in this Court on *Linscomb* in the summer of 1990. Steering committees were formed. Ronald Motley and Joseph F. Rice, of the law firm Ness, Motley, Loadholt, Richardson & Poole ("Ness Motley") were appointed to the steering committee, and Mr. Motley was designated as one of the coordinating counsel for the plaintiffs. The parties conducted set-

**5.** The decision of the Alameda County Superior Court in the *Andrus* case was eventually reversed on appeal. The California Court of Appeal ruled in *Fibreboard Corporation v. Continental Casualty Corp.,* No. A059716 (Cal.Ct.App. Oct. 19, 1994), that Fibreboard did not have the right to enter into assignment settlement agreements. On January 4, 1995, the California Supreme Court denied Fibreboard's petition for review, and the decision of the Court of Appeal is now final.

tlement meetings and explored whether an overall solution to asbestos injury litigation could be found.

Fibreboard approached Mr. Motley to discuss a global settlement because Mr. Motley had been outspoken about the need for alternative approaches to asbestos litigation, and because asbestos lawyers generally advised that Ness Motley involvement would be necessary for any settlement. Mr. Motley, along with his partner at Ness Motley, Mr. Rice, agreed to consider global settlement negotiations on an assignment basis.

Fibreboard also approached Steven Kazan and Harry Wartnick in late 1990 or early 1991. Mr. Kazan and Mr. Wartnick were selected because they had the most information about Fibreboard's West Coast activity, and the plaintiffs' bar looked to them for guidance in Fibreboard litigation.

Having decided to pursue global negotiations, the Ness Motley lawyers, Mr. Kazan and Mr. Wartnick ("Plaintiffs' Counsel")[6] retained the law firm of Caplin & Drysdale, Chartered, to represent them and assist them in handling certain highly complex tax, insurance, class action and commercial litigation issues that might arise in the negotiations and that they believed might be beyond their areas of personal expertise.

Fibreboard supplied Plaintiff's Counsel with information about its past claims experiences, historical settlement averages, and financial information, on a confidential basis. Plaintiffs' Counsel also drew upon a substantial body of knowledge about Fibreboard that had been collected by them and by other plaintiffs' counsel. During the many years of asbestos-related litigation involving Fibreboard, various plaintiffs' counsel had conducted massive discovery of Fibreboard, including document discovery and depositions of Fibreboard's corporate officers and knowledgeable employees. These counsel had exhaustively examined the evidence bearing upon Fibreboard's involvement with asbestos and its knowledge of the hazards of asbestos. Plaintiffs' Counsel also retained experts to provide an estimated value for Fibreboard

absent its asbestos liabilities and to project future asbestos claims against Fibreboard.

Armed with this information, Plaintiffs' Counsel set out to settle the post–1959 claims, which would be Fibreboard's responsibility, to use as a benchmark for assignment settlement of the pre–1959 claims. In November 1991, it appeared that the parties had agreed to price terms of $278 million for post–1959 cases, and $1.86 billion for pre–1959 cases, but negotiations broke down over questions of opt-out rights and contribution and indemnity.

Continental had been kept informed of the settlement negotiations and had attempted to participate, but Plaintiffs' Counsel insisted on negotiating only with Fibreboard as long as there was a coverage dispute. In March 1992, Continental proposed a settlement of just the pre–1959 cases, but Fibreboard objected to any settlement that addressed only part of the company's asbestos litigation problem.

With global negotiations stalled, Fibreboard began negotiating with Ness Motley. An agreement was signed in December 1992, now known as the "Initial Ness Motley Agreement." The Initial Ness Motley Agreement covered approximately 20,000 cases of Ness Motley and associated firms across the country, with provisions to add more cases. The average price per claim under the initial Ness Motley Agreement was $13,000, with post–1959 claims to be funded through the Pacific II settlement, and pre–1959 claims to be settled on an assignment basis.

The Initial Ness Motley Agreement required that Fibreboard obtain either Continental's consent to the assignment or a court order approving the assignment. Thus, pursuant to the Initial Ness Motley Agreement, on January 11, 1993 Fibreboard filed suit in this Court against Continental, *Fibreboard Corp. v. Continental Casualty Co.*, Civil Action No. 6:93cv11 (E.D.Tex.), seeking: (i) a declaration that the assignment in the Initial Ness Motley Agreement by Fibreboard to

---

**6.** Another Ness Motley partner, Joseph B. Cox, Jr., became involved in these negotiations in May 1992. Tr. at 1074–75. From that point on, the

term "Plaintiffs' Counsel" as used herein refers to Messrs. Rice, Cox, Kazan and Wartnick.

the claimants of Fibreboard's rights under the Continental insurance policy was valid; (ii) a declaration that the amounts Fibreboard assigned pursuant to the Initial Ness Motley Agreement were fair and reasonable; and (iii) a bar order cutting off Continental's equitable contribution rights as against Pacific. Such a bar order was simultaneously sought by Fibreboard against Continental in state court in Alameda County, California.

In February 1993 Continental's parent, CNA Financial Corporation, announced that Continental was ready to discuss a global settlement with Fibreboard. A status conference was held before this Court on March 10, 1993, at which representatives of Fibreboard, Continental and Ness Motley were present. The Court and the parties discussed the possible appointment of a Settlement Facilitator, and on March 23, 1993, the Court appointed Judge Patrick E. Higginbotham of the United States Court of Appeals for the Fifth Circuit to act as Settlement Facilitator in connection with the litigation pending in this Court between Fibreboard and Continental.

The parties set out the status of the matter and the parties' respective positions for Judge Higginbotham, and after hard-fought negotiations arrived at an agreement on April 9, 1993 (the "April 9 Agreement"). The April 9 Agreement provided, *inter alia,* that the parties would use their best efforts to achieve a global resolution of all of Fibreboard's asbestos liabilities, including the resolution of present cases and resolution of future asbestos personal injury claims. In the negotiations leading up to the April 9 Agreement, Continental took the position that any global settlement with Fibreboard had to be structured as a non-opt-out class action. For Fibreboard, the *sine qua non* was that any settlement be funded within Fibreboard's available insurance resources.

Pacific had not participated in the negotiations leading up to the April 9 Agreement because it considered the Pacific II Agreement to be binding. In response to the Fibreboard suit seeking approval of the Initial Ness Motley Agreement, and after having reached the April 9 Agreement, on April 13, 1993 Continental commenced a separate suit in this Court against both Fibreboard and Pacific, seeking a declaration that Continental's rights to equitable contribution against Pacific were unaffected by the Pacific II Agreement. *Continental Casualty Co. v. Pacific Indemnity Co. and Fibreboard Corp.,* Civil Action No. 6:93cv 223 (E.D.Tex.). That suit was subsequently consolidated with Fibreboard's action relating to the Initial Ness Motley Agreement.

Negotiations continued on an on and off basis, sometimes under Judge Higginbotham's supervision and sometimes independently. On July 13, 1993, Messrs. Rice and Cox met in Dallas with Judge Higginbotham and representatives of Continental and Fibreboard. At that meeting Judge Higginbotham offered his view that a global settlement covering both present and future cases appeared too complex to negotiate. Accordingly, he suggested that any global settlement be limited to future cases, and that a settlement of the Ness Motley cases—which could serve as the model for settling the presently pending Fibreboard cases—should precede further global negotiations.

With the continued active assistance of Judge Higginbotham, and after hard-fought, arm's-length negotiations, on August 5, 1993, Continental, Fibreboard and representatives of Ness Motley agreed to an amended Ness Motley Agreement (the "Substitute Ness Motley Agreement") settling substantially all of Ness Motley's presently pending claims. The Substitute Ness Motley Agreement resolved approximately 45,000 presently pending asbestos-related personal injury claims against Fibreboard. The Substitute Ness Motley Agreement, by its terms, was subject to approval by the Court as fair and reasonable, and such approval was sought from this Court on August 5, 1993. On August 9, 1993, after reviewing the agreement itself and conducting a hearing in which this Court considered reports from the parties, from Professor Samuel Dash, and from Judge Higginbotham, this Court gave that approval.

After the conclusion of the Substitute Ness Motley Agreement, Judge Higginbotham addressed a letter to this Court stating that "I am persuaded that given the momentum of

this successful negotiation, you should consider directing counsel to proceed [to explore a settlement of future claims]," and observing that "we could have no better set of parties and counsel to attempt its passage." By statement on the record on August 9, and a formal order of August 11, 1993, this Court appointed Plaintiffs' Counsel to act as negotiating counsel on behalf of a class of future claimants who were exposed to Fibreboard asbestos-containing products and who may have contracted or might in the future contract an asbestos-related disease. Judge Higginbotham continued to serve as Settlement Facilitator.

Negotiations continued, and on August 22, 1993, Continental and Pacific reached an agreement, subject to approval of their respective boards of directors, with respect to equitable contribution rights. Under that agreement, Pacific agreed to share with Continental the costs of funding a global settlement, with Continental funding 65% and Pacific funding the remaining 35%.

Global settlement negotiations continued, and on August 22, 1993, Plaintiffs' Counsel rejected Continental's $1.3 billion offer to settle all future claims. On the night of August 23, 1993, Continental increased the Insurers' offer by $200 million to $1.5 billion, and indicated that it would be their final offer. The Insurers deemed that the $1.5 billion amount was an amount that would and should be acceptable to Plaintiffs' Counsel. Plaintiffs' Counsel rejected the offer and negotiations broke off.

The parties agreed to make one final attempt to settle before the submission of the Coverage Case appeal on August 27, 1993. The parties convened in Tyler, Texas on Thursday, August 26, 1993, for one final negotiating effort, with Court assistance in the discussions. After several hours of negotiations, Continental's counsel agreed to recommend to Continental an increase of $25 million and Fibreboard agreed to contribute $10 million remaining from its settlement with Home Insurance Company. The next morning, the Insurers agreed to this increase, and a global settlement amount of $1.535 billion was reached.

Despite this agreement on the price of the settlement, Plaintiffs' Counsel continued to insist throughout the day on August 27 on a number of additional non-price conditions to a deal. These included issues with respect to interest payments on the $1.525 billion contribution of the Insurers to the Settlement, timing of the payment of the Fibreboard $10 million contribution, claims processing arrangements, the cut-off date for class membership (whether it should be the midnight preceding August 27 or the midnight yet to come), and, most significant, Plaintiffs' Counsel's insistence on a backup agreement between Fibreboard and the Insurers resolving the insurance dispute.

Throughout the negotiations that followed the meetings in Dallas the week of August 9, 1993, Plaintiffs' Counsel insisted that they would not agree to a global settlement unless Fibreboard and the Insurers would agree to a "backup" resolution of the Coverage Case that would become operative if for any reason a global settlement failed to achieve final court approval. Plaintiffs' Counsel were unwilling to permit a circumstance in which the Insurers might get a "free look" at the ultimate result in the Coverage Case while a global settlement was pending approval in the courts. The Insurers were unwilling to agree to such a condition unless such an agreement would cost them no more than a global settlement. This was resisted by Fibreboard, which contended that far more money would be required for defense costs outside the context of a global settlement to put Fibreboard in the same position it would be with a global settlement. The Insurers were nevertheless adamant that they would not agree to pay any more in the context of a backup agreement than in a global agreement, and, late in the afternoon of August 27, 1993, Fibreboard acceded to this principle as the price of permitting an agreement to be reached with respect to a global settlement. The backup settlement is what is now referred to as the "Trilateral Settlement."

During the afternoon of Friday, August 27, 1993, as discussions continued, the parties were advised that the California Court of Appeal, at the oral argument on the last phase of the Coverage Case appeal, had indi-

cated that it would rule on the appeal expeditiously. Although this acted as a further impetus for resolving remaining differences, not until five o'clock in the afternoon on August 27—after this Court advised the parties that it would soon close for business— was agreement reached in principle on the basic terms of the global settlement now before this Court (the "Global Settlement").

**F. The Global Settlement Agreement**

The terms of the Global Settlement agreement in principle were announced on August 27 in open court, as follows: Continental and Pacific, on behalf of Fibreboard, would pay into an escrow account their respective shares (pursuant to their sharing agreement) of the cash equivalent of $1.525 billion, plus interest commencing on August 27, 1993, such payment to be made no later than January 1, 1994. In addition, Fibreboard would make a contribution of $10 million to the settlement. These funds would be used by the Trust to resolve—either through litigation or settlement—the asbestos-related personal injury and death claims of a non-opt-out class of persons who have neither filed nor settled such claims before August 27, 1993. The unsettled present cases against Fibreboard would also be identified, and an additional amount—not as of then determined—would be budgeted to resolve them. It was anticipated that to the extent the unsettled present cases could be resolved for less than the budgeted amount, 80% of the difference would be transferred to the Trust.

In addition, Fibreboard would assign to the Trust any and all claims for contribution and indemnity it might have against other joint tortfeasors arising out of certain asbestos-related personal injury claims. Fibreboard would also be responsible for the intake administration of claims for five years, and would be required to provide the Trust with all information—including information that would otherwise be protected by privilege or trade secret confidentiality—as is reasonably necessary for the Trust to evaluate, defend and resolve the claims against it. The Insurers would be responsible for the costs associated with obtaining court approval of the Global Settlement, as well as any

fees of Plaintiffs' Counsel that might be awarded by this Court up to a maximum of 3% of the settlement amount, which fees would not be paid out of the Trust's funds.

As announced in this Court on August 27, 1993, in return for the monies to be paid under the Global Settlement, Fibreboard and the Insurers would receive "total peace" with respect to any and all claims, direct or indirect, involving the asbestos-related personal injury and death claims of the class members. The Global Settlement would also include the complete resolution of the insurance coverage dispute between Fibreboard and the Insurers. A prerequisite to presentation of the Global Settlement for court approval was the conclusion of a separate backup agreement between Fibreboard and the Insurers settling the insurance coverage litigation, and providing funds to Fibreboard to be used for the satisfaction of claims against Fibreboard in the event that the Global Settlement were not approved.

**G. The Trilateral Settlement Agreement**

On August 30, 1993, Fibreboard and representatives of the Insurers gathered in New York to work out the specific terms of the Trilateral Settlement, which was Plaintiffs' Counsel's precondition for negotiating the details of documenting the Global Settlement. Hard-fought and contentious negotiations finally yielded an agreement whereby the Insurers would pay a total of $2 billion as a complete resolution of all liabilities under the policies: in effect, a complete policy buyout.

The terms of the Trilateral Settlement, and of a series of provisions amending the April 9 Agreement, were described to this Court on September 9. Plaintiffs' Counsel then filed the complaint in this action later that day. Papers seeking provisional certification of the plaintiff class in this action (the Global Health Claimant Class) and a temporary restraining order against the filing of additional claims against Fibreboard or the Insurers were also filed. This Court thereafter granted the motions for provisional class certification and for a temporary restraining order.

Fibreboard and the Insurers thereafter turned to formally documenting the Trilater-

al Settlement. Lengthy, hard-fought, arm's-length negotiations toward that end finally resulted in the signing of the Settlement Agreement (the "Trilateral Settlement Agreement") on October 12, 1993. Following the signing of the Trilateral Settlement Agreement, Plaintiffs' Counsel and representatives of Fibreboard and the Insurers turned to the negotiation and drafting of a written agreement reflecting the Global Settlement. Although the terms of the global agreement in principle had been put on the record on August 27, 1993, numerous detailed provisions that are contained in the fully documented agreement remained to be and were negotiated over a two-month period commencing in mid-October 1993. In addition, the "Third–Party Claimant Class Settlement" was negotiated during this time period. The formal documentation of the Global Settlement (the "Global Settlement Agreement"), as well as the Third–Party Claimant Class Settlement (entitled "Defendant Class Settlement Agreement" and now referred to as the "Third–Party Claimant Class Settlement Agreement"), were finalized, including the signatures of all the parties thereto, on December 23, 1993.

## KEY SETTLEMENT TERMS

There are four settlement agreements before the Court for approval: the Global Settlement, the Global Third–Party Claimant Class Settlement, the Trilateral Settlement, and the Longshore Settlement. The Global Settlement is intended to settle all future asbestos-related personal injury claims against Fibreboard and its Insurers. In order to accomplish one of the primary goals of the Global Settlement—to get Fibreboard and the insurers out of the asbestos litigation business—some mechanism had to be developed for dealing with contribution and indemnity claims arising out of Global Health Claimant Class member claims against other asbestos defendants. The Global Third–Party Claimant Class Settlement addresses these issues. The Trilateral Settlement, which was negotiated as a back-up to the Global Settlement, is essentially a buy-out of the Continental and Pacific policies, which would provide Fibreboard with a $2 billion fund to settle or defend present and future

asbestos claims against it. The Longshore Settlement was negotiated to foreclose the possibility that the Global Settlement might adversely affect the rights of Global Health Claimant Class members who are covered by the Longshore and Harbor Workers' Compensation Act (LHWCA) 33 U.S.C. § 901, et seq.

### A. The Global Settlement

The Global Settlement settles all claims for asbestos-related personal injury or death against Fibreboard, Continental and Pacific by all members of the Global Health Claimant Class, and provides a structure for the handling of the proceeds of the $1.525 billion Coverage Case settlement and the additional $10 million to be contributed by Fibreboard. In addition, the Global Settlement Agreement discharges the Insurers from any obligations in connection with the insurance policies, whether with respect to asbestos-related personal injury and death claims or not, except for obligations specifically assumed or preserved in the various agreements between them.

The purposes of the Global Settlement Agreement are: (i) to resolve finally all asbestos-related personal injury claims of the Global Health Claimant Class against Fibreboard and the Insurers, and to direct such claims to the Trust; (ii) to provide for a simple, efficient process by which persons who were injured through exposure to Fibreboard asbestos could quickly obtain a fair settlement or resolution of their claims while safeguarding the claimants' rights to proceed against the Trust in the tort system; (iii) to enhance the likelihood that assets would remain available to injured class members whose claims develop far in the future by limiting how much of the Trust's assets can be paid in any given year; (iv) to prioritize payments so that in the event of any shortfall the sickest claimants are paid first; and (v) to protect the Trust's assets from unduly risky investments.

Under the Global Settlement, Fibreboard, Continental and Pacific receive full releases from the members of the Global Health Claimant Class with respect to any asbestos-

related personal injury or death claim, and all such claims will be directed to a Trust for processing and payment pursuant to the procedures set forth in the Trust Distribution Process ("TDP"). In order to receive compensation, claimants must first seek to settle with the Trust. If a settlement cannot be reached, the next step is mediation and then arbitration. If an acceptable resolution still cannot be reached, the claimant may then try the claim in the tort system, subject to the overall limit of $500,000 per claim.[7] Claims that are resolved against the Trust before resort to the tort system will be paid over three years; claimants who exercise their right to exit to the tort system after exhausting the specified claims processing procedures will be paid over as few as five years or as many as ten.

The TDP contains certain spendthrift provisions that limit the proportion of the Trust's assets that can be paid out in any given year to ensure that funds will be available to claimants who assert claims against the Trust years into the future. If funds prove insufficient in any given year to pay all claimants, claimants suffering from more serious diseases are generally paid before those with less severe injuries, and within categories of injuries those claimants waiting the longest are paid first.

## B. The Third–Party Claimant Class Settlement

The terms of the Global Settlement Agreement are intended to provide the Insurers and Fibreboard with total protection with respect to claims arising from Global Health Claimant Class Member Claims, i.e., Global Third–Party Claims. Thus, the Global Settlement Agreement provides that it cannot be finally approved until the discharge of and injunction against Global Third–Party Claims are obtained.[8]

To this end, a settlement with respect to the claims of members of the Global Third–Party Claimant Class has been agreed upon by Owens–Illinois, as representative of the Global Third–Party Claimant Class, the Global Health Claimant Class representatives, Fibreboard and the Insurers. This settlement is embodied in the Third–Party Claimant Class Settlement Agreement. The Third–Party Claimant Class Settlement Agreement represents a resolution of all Global Third–Party Claims that could be asserted against Fibreboard, Continental or Pacific.

The Third–Party Claimant Class Settlement Agreement contains three principal provisions: (i) that the Global Third–Party Claimant Class will release Fibreboard and the Insurers as to any and all Global Third–Party Claims and agree that Global Approval Judgment shall bar and enjoin permanently Global Third–Party Claimant Class members from prosecuting any Global Third–Party Claims against Fibreboard or the Insurers; (ii) that Fibreboard and the Insurers will release the Third–Party Claimant Class as to any and all contribution or indemnification claims; and (iii) that members of the Third–

---

7. Punitive damages and prejudgment interest are not available to any claimant against the Trust.

8. The Global Settlement Agreement contains provisions that deal with the possibility of the Court being unable to issue an order barring all such Global Third–Party Claims against Fibreboard, Continental and Pacific, including an agreement by members of the Global Health Claimant Class to reduce, under certain circumstances, any judgments they obtain against Global Third–Party Claimant Class members in such amounts (up to but not in excess of the amount of the judgment against any such Global Third–Party Claimant Class member) as may be necessary to permit the Court to issue orders providing for the discharge of and injunctions against such Global Third–Party Claims as is required for the entry of Global Approval Judgment.

In response to objections from two potential Global Third–Party Claimant Class Members, the Commonwealth of Pennsylvania and the State of Rhode Island, the Settling Parties agreed that the fifty states of the United States (and their governmental units and divisions entitled to immunity under the Eleventh Amendment), and governments of foreign nations (and units and divisions thereof) entitled to sovereign immunity are not subject to the Court's jurisdiction. The Global Settlement Agreement was therefore amended to provide that Global Health Claimant Class members will reduce judgments in their favor against such entities in such amounts as may be necessary to extinguish any such Global Third–Party Claims under applicable law.

Party Claimant Class will have the rights set forth in Section H of the TDP.

Section H, in turn, affords different rights in three different scenarios that can arise. First, where a personal injury claimant liquidates his or her claim against the Trust before obtaining a judgment against a Global Third–Party Claimant Class member, the class member receives a reduction of any judgment subsequently entered against it to reflect the personal injury claimant's recovery from the Trust, in whatever amount is dictated by the set-off, contribution, indemnity or similar principles of the applicable state law. Second, where a personal injury claimant exhausts the Trust process and litigates against the Trust in the tort system, and also files suit against a Global Third–Party Claimant Class member, the class member likewise receives a judgment reduction, in whatever amount is dictated by the applicable state law, for any joint-and-several portion of any judgment against it reflecting Fibreboard's liability share. Third, where a personal injury claimant obtains a judgment against a Global Third–Party Claimant Class member prior to liquidating his or her claim against the Trust, and the Global Third–Party Claimant Class member pays the joint-and-several portion (if any) of that judgment, it succeeds to whatever rights the personal injury claimant would have had against the Trust.[9]

The salient feature of the Third–Party Claimant Class Settlement is thus that it preserves all rights the Global Third–Party Claimant Class member would possess as against the Trust under applicable law in those cases where a personal injury claimant recovers from the Trust first; and it affords the Global Third–Party Claimant Class member all of the personal injury claimant's rights against the Trust (with the minor exception of the right to exit to the tort system) in those cases where such a claimant recovers from the class member first. For this reason, the Third–Party Claimant Class Settlement affects Global Third–Party Claimant Class members principally in that their contribution and indemnification claims will be addressed through set-offs and subrogation rights stemming from settlements and proceedings involving the Trust, rather than Fibreboard or the Insurers.

The Third–Party Claimant Class Settlement provides a substantial benefit to Global Third–Party Claimant Class members. By facilitating the Global Settlement, the Third–Party Claimant Class Settlement creates a trust with over $1.5 billion available to pay claims and, in accordance with applicable law, to offset obligations of members of the Global Third–Party Claimant Class. Very few objections to the Third–Party Claimant Class Settlement have been asserted.

In addition, the Third–Party Claimant Class Settlement provides a reasonable, reliable, fair and predictable mechanism to handle third-party claims. Because the Third–Party Claimant Class Settlement avoids intensive litigation of the sort that occurred in the *Manville* proceedings, the complexities of attempting to create a new rule in the tort system, and the uncertainties of leaving third-party issues to further litigation, this Court finds that the Third–Party Claimant Class Settlement is better than any alternative.

The Third–Party Claimant Class Settlement Agreement was the product of negotiations among Plaintiffs' Counsel, Fibreboard and representatives of the major asbestos manufacturers. These negotiations were sophisticated, arm's-length and non-collusive. Indeed, these negotiations resolved an issue that has been the subject of contentious disputes in other asbestos-related settlement proceedings, such as *Georgine* and *Manville*.

The overwhelming credible testimony demonstrates that the Third–Party Claimant Class Settlement Agreement is fair, reasonable and adequate, and that its benefits far outweigh the incidental restrictions it places on members of the Global Third–Party Claimant class.

## C. The Trilateral Settlement

The Trilateral Settlement Agreement, settles the insurance coverage disputes between

---

**9.** There is one exception: if the class member were not satisfied with the Trust's offer, it—unlike a personal injury claimant against the Trust—would not be permitted to exit to the tort system; the matter would instead be resolved through binding arbitration.

Fibreboard and the Insurers whether or not the Global Settlement is approved or successfully withstands subsequent attack. The Trilateral Settlement Agreement provides that, upon specified court determinations, Continental and Pacific shall be discharged from any further obligations or liabilities to Fibreboard or to any other person or entity under or in connection with the insurance policies issued to Fibreboard whether asbestos-related or not (except for obligations that an Insurer has specifically assumed or preserved under the Trilateral Settlement Agreement, the April 9 Agreement, the Global Settlement Agreement or the Supplemental Agreement). The Trilateral Settlement Agreement does not, however, preclude the assertion of any such claims against Fibreboard. In addition, the Trilateral Settlement Agreement provides for Fibreboard to indemnify Continental and Pacific against certain further asbestos-related personal injury claims whether or not the Global Settlement is approved or successfully withstands collateral attack.

If the Global Settlement is not approved but the Trilateral Settlement is approved, the $1.525 billion plus interest from the Insurers, plus an additional $475 million, less certain deductions, will be made available to Fibreboard, either directly or through a trust, to enable Fibreboard to pay defense costs and claims with respect to asbestos-related personal injuries—not only claims not filed or settled prior to August 27, 1993, but also asbestos-related personal injury claims against Fibreboard that were unsettled as of August 23, 1993. Fibreboard may also use up to $65 million from these funds for costs associated with asbestos-related property damage claims and non-asbestos claims.

The Trilateral Settlement was the result of hard fought, arm's-length negotiations between Fibreboard and Continental. The negotiations leading to the Trilateral Settlement were intense and contentious, and there is a complete absence of evidence of collusion in connection therewith. The Court is satisfied that the Trilateral Settlement is fair and reasonable.

## D. The Longshore Settlement

On December 5, 1994, the Global Health Claimant Class representatives, on behalf of themselves and the Global Health Claimant Class, Bethlehem Steel Corporation, on behalf of itself and a class of employers and insurance carriers (the Longshore Defendant Class), and the Director, Office of Workers' Compensation Programs, United States Department of Labor (the "Director"), entered into a settlement with respect to certain rights and obligations that members of the Global Health Claimant Class and members of the Longshore Defendant Class might have under the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. §§ 901, *et seq.*, and related statutes.

LHWCA provides that if a person entitled to compensation under LHWCA settles a claim against a third-party for which he or she would be entitled to receive Longshore benefits for less than the LHWCA compensation, the employer is liable for compensation only if the person entitled to benefits first obtained approval of the settlement from the employer and the employer's insurance carrier. 33 U.S.C. § 933(g)(1). If the person entitled to compensation obtains a judgment or settles a claim for more than the LHWCA compensation, the person entitled to benefits is required to notify the Longshore Employer of the judgment or settlement. 33 U.S.C. § 933(g)(2). Failure to comply with § 933(g)(2)'s notice requirements terminates the employer's obligation to pay Longshore benefits.

Plaintiffs' Counsel, the Secretary of Labor, and certain intervenors with potential LHWCA claims were concerned that Longshore employers might assert that the Global Settlement and related judgment constitute either a settlement under § 933(g)(1) or (g)(2) or a judgment under § 933(g)(2) for which the applicable notice or pre-approval requirements had not been satisfied.

Bethlehem agreed to serve as a representative of a class of Longshore employers. Bethlehem consulted with other Longshore employers during the course of negotiations, and eventually a settlement was reached between Bethlehem and the settling parties in which it was agreed that the final approval of

the Global Settlement would not constitute a "settlement" under 33 U.S.C. § 933(g) which would operate to create a forfeiture of LHWCA compensation rights by Global Health Claimant Class members against the Longshore Defendant Class and that Longshore Defendant Class members would have the right (i) to obtain liens or credits; (ii) to receive notice and an opportunity to approve settlements; and (iii) to be informed of judgments and arbitration awards when Global Health Claimant Class members pursue claims against the Trust.

On February 2, 1995, the Court conducted a hearing on the fairness of the Longshore Settlement. No Longshore Defendant Class member or Global Health Claimant Class member appeared at the hearing to voice objections to the settlement, and no Longshore Defendant Class member filed written objections to the settlement. The Longshore Settlement clears a potential obstacle to final approval to the Global Settlement, which in turn potentially reduces the net obligations of members of the Longshore Defendant Class to members of the Global Health Claimant Class. The Court finds the Longshore Settlement to be fair and reasonable.

## JURISDICTION

This Court has subject matter jurisdiction over these proceedings pursuant to 28 U.S.C. § 1332. Diversity of citizenship is present and is uncontested, but the Ortiz Intervenors contend that § 1332's amount-in-controversy requirement is not satisfied.

For diversity jurisdiction to exist, the amount-in-controversy requirement—allegations of damage in excess of $50,000—must be satisfied. 28 U.S.C. § 1332(a).

■ In determining the amount in controversy, "the sum claimed by the plaintiff controls ... [unless it] appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). Although the plaintiffs bear the burden of proving the requisite amount in controversy, the burden is not a heavy one, and the plaintiff need demonstrate only that it is

not impossible that he or she will recover more than $50,000. *See Seafoam, Inc. v. Barrier Systems, Inc.*, 830 F.2d 62, 66 (5th Cir.1987). In determining the amount in controversy, claims for punitive damages must be included in the computation. *See Bell v. Preferred Life Assurance Soc.*, 320 U.S. 238, 240, 64 S.Ct. 5, 6, 88 L.Ed. 15 (1943). The amount-in-controversy requirement is satisfied because each Class member could lawfully allege damages in excess of $50,000.

■ The amount-in-controversy requirement may be satisfied in mass-tort class actions, including class actions consisting partly or entirely of people who had not, at the time of filing, manifested any symptoms, illness or injury. *See, e.g., In re Joint E. & S. Dist. Asbestos Litigation ("Manville")*, 982 F.2d 721, 734 (asbestos: amount-in-controversy requirement satisfied although some members were "exposure only"); *Carlough v. Amchem Prods. Inc.*, 834 F.Supp. 1437, 1456–62 (E.D.Pa.1993) (asbestos: same); *In re A.H. Robins Co.*, 880 F.2d 709, 725 (4th Cir.) (Dalkon Shield: "indisputable that it cannot be said to a 'legal certainty' that the jurisdictional amount herein was not satisfied" where the class included women who had used the shield but who had not yet manifested an injury), *cert. denied*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989); *In re "Agent Orange" Product Liability Litigation*, 996 F.2d 1425, 1434 (2d Cir.1993) (Agent Orange), *cert. denied*, —— U.S. ——, 114 S.Ct. 1125, 127 L.Ed.2d 434 (1994). Those members of the Global Health Claimant Class who have been exposed to asbestos, but who have not yet developed recognizable disease or injury, seek, *inter alia*, damages to compensate for fear of cancer and for enhanced risk of developing cancer, damages tied to the need to undergo medical monitoring to detect the early development of asbestos-related disease, and punitive damages. Each Global Health Claimant Class member, including each so-called "exposure-only" claimant, has a good faith basis for arguing for application of authorities permitting recovery for fear of cancer, risk of cancer and medical monitoring. *See, e.g., Potter v. Firestone Tire and Rubber Co.*, 6 Cal.4th 965, 25

Cal.Rptr.2d 550, 570–71, 863 P.2d 795, 816 (1993); *Miranda v. Shell Oil Co.*, 17 Cal. App.4th 1651, 26 Cal.Rptr.2d 655 (1993); *Barras v. Monsanto Co.*, 831 S.W.2d 859 (Tex.App.—Houston [14 Dist.] 1992, writ denied). Fibreboard's headquarters are located in California, a state that recognizes claims for medical monitoring and fear of cancer. Accordingly, such claims could be asserted against Fibreboard by all members of the Global Health Claimant Class.

■ Furthermore even if some class members could not allege damages in excess of $50,000, the Court would still have jurisdiction because all the Class representatives could lawfully allege damages in excess of $50,000. In a class action, so long as the class representatives meet the amount-in-controversy requirement, all other class members fall within this Court's supplemental jurisdiction, regardless of the value of their claims. *Moores Federal Practice*, ¶ 0.97[5], at 928 (2d ed. 1994); 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 6.11, at 6–48 (3d ed. 1992).

## CLASS ACTION PREREQUISITES

### A. Rule 23(a) Prerequisites

Rule 23(a) lists four prerequisites to a class action: (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. A class may be certified if all four prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met and one or more of the provisions of Rule 23(b) is satisfied. "The district court has wide discretion in deciding whether or not to certify a proposed class." *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 471–72 (5th Cir.1986).

Rule 23 requirements apply to all federal class actions; however, a number of courts have held that they are often more readily satisfied in the settlement context because the issues for resolution by the Court are more limited than in the litigation context.

*See In re A.H. Robins Co.*, 85 B.R. 373, 378 (E.D.Va.1988), *aff'd*, 880 F.2d 709 (4th Cir. 1989); *Officers for Justice v. Civil Service Comm'n of City and County of San Francisco*, 688 F.2d 615, 633 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983); *In re Dennis Greenman Securities Litigation*, 829 F.2d 1539, 1543 (11th Cir.1987); *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 158 (S.D.Ohio 1992), *appeal dismissed without op.*, 995 F.2d 1066 (6th Cir. 1993); *see also* 2 *Newberg on Class Actions* § 11.28 (3rd ed. 1992). Courts have approved settlements and finally certified settlement classes while at the same time holding that class certification for litigation purposes might be improper. *See, e.g., Officers for Justice*, 688 F.2d at 633; *In re Anthracite Coal Antitrust Litigation*, 79 F.R.D. 707, 713–14 (M.D.Pa.1978) (court approved class settlement while noting that certification for litigation purposes would be doubtful), *aff'd in part without op. and vacated in part without op. sub nom. Colonial Fuel Co. v. Blue Coal Corp.*, 612 F.2d 571 (3d Cir.1979) (table); *Wilkes–Barre Steam Heat Co. v. Blue Coal Corp.*, 612 F.2d 576 (3d Cir.1979) (table). Other Courts have held that Rule 23 prerequisites may not be relaxed merely because a settlement class is involved rather than a litigation class. *See In re General Motors Corporation Pick–Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 799 (3rd Cir.1995). This Court approaches the Rule 23(a) prerequisites under the assumption that Rule 23(a)'s requirements are no different in the settlement context than in the litigation context.

Rule 23(a) provides that a class action may be brought if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

### 1. Numerosity

The numerosity requirement of Rule 23(a) is obviously satisfied. With Class membership numbering in the hundreds of thou-

sands, joinder of the Class members' claims would plainly be impracticable. *See Boykin v. Georgia–Pacific Corp.*, 706 F.2d 1384, 1386 (5th Cir.1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 999, 79 L.Ed.2d 231 (1984) (317–member class met numerosity requirement).

### 2. *Commonality*

■ Rule 23(a) requires that there be at least one legal or factual issue common to all class members. *See* 3B J. Moore and J. Kennedy, *Moore's Federal Practice* ¶ 23.06-1, at 23–159–23–160 (2d ed. 1993); *Jenkins*, 782 F.2d at 472 ("The threshold of 'commonality' is not high," as "the rule requires only that resolution of the common questions affect all or a substantial number of the class members"); *Walker v. Jim Dandy Co.*, 638 F.2d 1330, 1336 (5th Cir.1981). That requirement has been met. All Class members here have an overriding common interest in eliminating the risk posed by the coverage litigation and creating a substantial fund of insurance proceeds to provide compensation for Class members. Consequently, many major issues presented by the Class are common to all of its members, including whether claimants against Fibreboard have a right to substantial insurance proceeds notwithstanding the existence of a coverage dispute; and whether some curtailment of the Class's rights in the tort system is appropriate in order to enable a resolution of the coverage dispute that equitably distributes the insurance proceeds. *See Georgine*, 157 F.R.D. at 316; 2 *Newberg on Class Actions* § 11.28, at 11–58–11–60. *See also Jenkins*, 782 F.2d at 473 (affirming class certification of limited issues including liability but not damage and causation).

### 3. *Typicality*

■ "The 'typicality' requirement focuses . . . on the similarity of the legal and remedial theories behind [the named and unnamed plaintiffs'] claims." *Jenkins*, 782 F.2d at 472. Consequently, in the settlement context, it "requires proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement." 2 *Newberg on Class Actions* § 11.28, at 11–58.

The requirement may be met even though "[t]he degree of harm may differ between the representatives and members of the class according to the degree of exposure (if any), the effects of the asbestos disease process, and the nature of the disease contracted by the individual." *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 272 (E.D.Tex.1985), *aff'd*, 782 F.2d 468 (5th Cir.1986); *see also In re General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 817 (3rd Cir.1995) (noting that individual issues of causation, reliance, and damages do not ordinarily preclude class action treatment of mass torts); *Ladd v. Dairyland County Mut. Ins. Co.*, 96 F.R.D. 335, 337 (N.D.Tex.1982). The legal and remedial theories of the representative plaintiffs are typical of the Class. All Class members' claims arise from exposure to asbestos for which Fibreboard may bear legal liability, and all Class members share the following common interests: (i) avoiding the potentially disastrous results of a loss by Fibreboard in the Coverage Case appeal; (ii) maximizing the total settlement contribution from Fibreboard and the Insurers; (iii) streamlining the procedures for the filing, processing and resolution of claims, and thereby reducing transaction costs and delays in compensation; (iv) minimizing the percentage of their compensation diverted from them to pay attorneys' fees; and (v) adopting procedures that provide for payments to claimants in an equitable manner.

### 4. *Adequacy of Representation*

The adequacy requirement contains two elements: "The first concerns the qualifications of counsel, and the second concerns the relationship between the interests of the class representatives and the interests of the other class members." *Jenkins*, 109 F.R.D. at 273.

### a. *Class Counsel*

Class Counsel are highly competent, skilled and experienced members of the plaintiffs' asbestos bar, were well qualified to serve as Class Counsel in this case, and the Court is satisfied that Class Counsel adequately represented the class.

The Ortiz Intervenors contend that Class Counsel's representation was inadequate due to a conflict created by their representation of present claimants at the same time they were negotiating on behalf of the Class. The Court is satisfied that any potential conflicts that could theoretically have arisen between Class Counsel's present claimants and the Class never materialized. Indeed, given the short window of opportunity to negotiate a global settlement created by the Coverage Case appeal, the Court finds it unlikely that counsel less intimately involved with Fibreboard's overall asbestos problem could have reached nearly so favorable a settlement for the Class.

▮ The Ortiz Intervenors also contend that the negotiation of an attorneys' fee agreement more or less at the same time as the negotiation of the Global Settlement taints Class Counsel's representation of the Class.

When fee and settlement negotiations occur simultaneously, there is a danger of collusion between class counsel and the defendant. *In re General Motors Corporation Pick–Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d at 803. In the instant case, however, there is considerably less to the agreement than meets the eye. As a part of the Global Settlement Agreement, the Insurers agreed to fund an attorneys' fee award in addition to the settlement fund in an amount set by the Court up to 3% of the total settlement. Continental was willing to bear the costs of administering the settlement, but it was not willing to fund attorneys fees up to the 25% sometimes awarded class counsel in securities fraud class actions. Class Counsel understood, and Judge Higginbotham made clear to them during the negotiations, that they could not expect that any particular fee would be awarded. There is nothing about the fee agreement that would lead the Court to believe that Class Counsel's representation of the Class was in any way compromised.

#### b. Class Representatives

▮ The Class representatives have also adequately represented the Class. Class representatives satisfy the adequacy require-ment unless they have "an insufficient stake in the outcome or interests antagonistic to the unnamed members." *Jenkins,* 782 F.2d at 472; *see also Georgine,* 157 F.R.D. at 317 ("The key question is whether their interests are antagonistic.") (*quoting Steiner v. Equimark Corp.,* 96 F.R.D. 603, 610 (W.D.Pa. 1983)) (emphasis in original). And "so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes." *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 208 (5th Cir.1981).

The Class representatives have a sufficient stake in the outcome, and the interests of the Class representatives and the members of the Class are not antagonistic. The Class representatives span the range of the various medical categories under the Trust Distribution Process and include both already-impaired and not-yet-impaired claimants. The Class representatives and the members of the Class—all of whom are equally at risk in the coverage litigation—are united in seeking the maximum possible recovery for their asbestos-related claims. *See Jenkins,* 109 F.R.D. at 274.

The Class representatives played a sufficient role in the action, notwithstanding that they were named after the agreement in principle was reached and that they relied on Class Counsel in the subsequent settlement negotiations. "It is not a requirement that representative plaintiffs have specific knowledge of the claims and issues in the action, or that they play a personal role in the direction and management of the action." *Georgine,* 157 F.R.D. at 317. *See Longden v. Sunderman,* 123 F.R.D. 547, 558 (N.D.Tex.1988) (the law well recognizes that, in "complex" matters, "it is unreasonable to expect the class representatives to possess detailed, personal knowledge"); *Gibb v. Delta Drilling Co.,* 104 F.R.D. 59, 77 (N.D.Tex.1984). "[T]he primary criterion for determining whether the class representative has adequately represented his class ... is whether the representative, through qualified counsel, vigorously and tenaciously protected the interests of the class." *Gonzales v. Cassidy,*

474 F.2d 67, 75 (5th Cir.1973) (emphasis added); *accord Longden v. Sunderman,* 123 F.R.D. at 559; *Durrett v. John Deere Co.,* 150 F.R.D. 555, 558 (N.D.Tex.1993).

## B. Rule 23(b)(1)(B)

Rule 23(b)(2)(B) of the Federal Rules of Civil Procedure provides that a class action may be maintained if the prerequisites of subdivision (a) of Rule 23 are satisfied, and in addition "the prosecution of separate actions by or against individual members of the class would create a risk of ... adjudication with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."

■ Rule 23 is to be interpreted according to its "plain meaning." *See, e.g., Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Cadence Indus. Corp.,* 493 U.S. 120, 123, 110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989). As used in the Rule, the requisite "risk" of impairment need not be a certainty or even a better-than 50% likelihood. Instead, the term "risk" refers only to a "substantial probability," which has been described as—"more than a mere possibility" but "less than a preponderance." *In re Joint Eastern and Southern Dist. Asbestos Litigation ("Manville"),* 129 B.R. 710, 765, *vacated on other grounds,* 982 F.2d 721 (2d Cir.1992), *modified,* 993 F.2d 7 (2d Cir.1993); *accord In re Granada Partnership Sec. Litigations,* 803 F.Supp. 1236, 1244 (S.D.Tex.1992); *In re Joint Eastern and Southern Dist. Asbestos Litigation ("Eagle–Picher"),* 134 F.R.D. 32, 35 (E. & S.D.N.Y.1990); *In re First Commodity Corp. Customer Accounts Litigation,* 119 F.R.D. 301, 312 (D.Mass.1987); *Jenkins,* 109 F.R.D. at 276–77; *In re Jackson Lockdown/MCO Cases,* 107 F.R.D. 703, 713 (E.D.Mich.1985); *In re "Agent Orange" Product Liability Litigation,* 100 F.R.D. 718, 726 (E.D.N.Y.1983), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988).

■ No one disputes that there was a significant risk—more than a mere possibility—that Fibreboard would lose on one or more issues in the Coverage Case, or that Fibreboard might lose its insurance coverage as a result of its assignment settlement program. The Court heard expert testimony regarding the risks, and the risk inherent in Fibreboard's insurance dispute is further reflected in the fact that Fibreboard's settlement average under its no-cash assignment settlement program was more than twice its the settlement average under the 40% cash SSP. The risk that available funds could be inadequate to pay all claims constitutes a risk of substantial impairment under Rule 23(b)(1)(B).

■ The need to protect Class members' "common interests" in the insurance proceeds subject to the coverage dispute demands a unitary resolution permitting equitable distribution. Numerous courts applying Rule 23(b)(1)(B) have certified classes under the Rule where allowing separate actions would have created a risk that early individual adjudications would have exhausted all available assets. *See, e.g., Manville,* 982 F.2d at 738–39; *In re Drexel Burnham Lambert Group,* 960 F.2d 285, 292 (2d Cir. 1992), *cert. dismissed,* — U.S. —, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *In re Silicone Gel Breast Implant Products Liability Litigation* (MDL 926), CV 93–P–11433–S (N.D.Ala., June 1, 1993); *In re Granada,* 803 F.Supp. at 1244; *Eagle–Picher,* 134 F.R.D. at 35; *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1418 (E.D.N.Y.1989), *aff'd,* 907 F.2d 1295 (2d Cir. 1990); *Bush v. Rewald,* [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,999, 1986 WL 15338 (D.Haw., Sept. 4, 1986); *In re Jackson Lockdown/MCO Cases,* 107 F.R.D. 703, 712–13 (E.D.Mich.1985); *Coburn v. 4–R Corp.,* 77 F.R.D. 43, 45–46 (E.D.Ky.1977). *See also Jenkins v. Raymark Indus., Inc.,* 109 F.R.D. 269, 276 (E.D.Tex.1985), *aff'd,* 782 F.2d 468 (5th Cir.1986) ((b)(1)(B) certification is appropriate where "the brink of insolvency will be reached during the litigation").

The Global Settlement resolves both the insurance coverage dispute between Fibreboard and the insurers, and the claims of all class members against Fibreboard and the insurers. The Global Settlement involves a

uniquely situated defendant in a mass tort that has created unparalleled problems for the courts and the litigants. The Global Settlement resulted from a unique set of circumstances not likely to be repeated. Resolution of the insurance dispute required a unitary settlement in a proceeding in which all claims were compromised. On these facts, allowance of individual adjudications by class members would have destroyed the opportunity to compromise the insurance coverage dispute by creating the settlement fund, and would have exposed the class members to the very risks that the settlement addresses—a situation that falls squarely under Rule 23(b)(1)(B). *See In re Jackson Lockdown*, 107 F.R.D. at 708, 712; *In re A.H. Robins*, 85 B.R. at 380.

Whether mandatory class certification is appropriate in the typical case where a class action is settled with a defendant's own funds, or with insurance funds that are not the subject of genuine and vigorous dispute is not a question this Court need answer here. In such a case, if the settlement failed because separate actions were permitted, the defendant would retain the settlement funds (or the insurance coverage), and there might not be the "impair[ment]," to class members' "ability to protect their interests" required for mandatory class certification by Rule 23(b)(1)(B), so long as the defendant has adequate funds to pay all class members' claims. The destruction of the settlement fund here, however, constitutes a "risk" within the meaning of Rule 23(b)(1)(B) because the source of that fund (and any meaningful recovery for the Class) is a non-defendant whose obligations are seriously in doubt and may well disappear entirely if the settlement were to fall through—with the result that Class members could not then secure their due through litigation.

 The Ortiz Intervenors and the Flanagan Intervenors object that this class action cannot be maintained under Rule 23(b)(1)(B), alleging that there is no genuine "limited fund" because Fibreboard is allowed to retain most of its non-insurance assets under the settlement. The objection is misplaced for two reasons. First, although the limited fund situation is commonly associated with Rule 23(b)(1)(B), the Rule itself does not require a limited fund. Second, even under a limited fund analysis, and there is a limited fund in this case, *see* Conclusions of Law ¶¶ 37–39, the fact that Fibreboard retains most of its equity under the Global Settlement is irrelevant to the propriety of mandatory class certification. The Court need not ensure that a defendant designate a particular source of its assets to satisfy the class' claims; the Court need only determine whether the amount recovered by the class is fair. *Drexel*, 960 F.2d at 293. There is no authority or reason why Class Counsel may settle a 23(b)(1)(B) class action only if all of the defendant's resources are included in the settlement. Such a rule would make no sense, would discourage settlements and has been rejected. *See, e.g., In re Granada*, 803 F.Supp. at 1244; *Bush*, [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,999. In terms of the expected recovery for class members, the Global Settlement is far superior to either the Trilateral Settlement or to no settlement at all.

### FAIRNESS ISSUES

 Federal Rule of Civil Procedure 23(e) requires the Court to determine whether a class action settlement is "fair, adequate, and reasonable." *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982); *In re Corrugated Container Antitrust Litigation*, 643 F.2d at 207. The Court cannot modify the terms of the proposed settlement; rather, the Court must approve or disapprove of the proposed settlement "as a whole." *See, e.g., Evans v. Jeff D.*, 475 U.S. 717, 727, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986); *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1160 (11th Cir.1983); *Cotton v. Hinton*, 559 F.2d 1326, 1331–32 (5th Cir. 1977). There is a strong presumption in favor of the settlement's fairness. *Parker*, 667 F.2d at 1209; *Cotton v. Hinton*, 559 F.2d at 1331; *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 660, 667 (M.D.Ala.1988); Manual for Complex Litigation, § 30.41 (2nd ed. 1985).

The proposed settlement is not required to "achieve some hypothetical standard con-

structed by imagining every benefit that might someday be obtained in contested litigation." *United States v. Allegheny–Ludlum Industries, Inc.,* 517 F.2d 826, 850 (5th Cir.1975). Rather, "compromise is the essence of settlement," and the Court may "rely upon the judgment of experienced counsel for the parties." *Cotton,* 559 F.2d at 1330 (some citations omitted).

## A. The Reed Factors

■ The Fifth Circuit has set forth six factors to guide the Court's assessment of the fairness, reasonableness and adequacy of a proposed class-action settlement:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of class counsel, class representatives and absent class members.

*Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983). All factors support approval of the Global Settlement here.

Asbestos litigation is undoubtably the most "mature" of all mass tort litigation. The primary factual and legal issues such as disease causation, product, jobsite and defendant identification and standard of care have been identified and developed through extensive litigation. Despite the maturity of asbestos litigation, it continues to be expensive, time-consuming, and complex. The problem now is that asbestos litigation has become over-mature. Issues that have already been fully developed and resolved are nonetheless rehashed and relitigated, all contributing to the delay, high transaction costs, and arbitrary results that have become the hallmarks of asbestos litigation.

At the time the Global Settlement was reached, Class Counsel were thoroughly familiar with asbestos litigation in general and with Fibreboard's situation in particular, and were extremely well-equipped to represent the interests of the Class. The Global Settlement was the result of hard fought, arm's-length negotiations among the Settling Parties. Indeed, those negotiations were frequently contentious and even bitter. At numerous points the negotiations broke down and were almost scuttled entirely. Not until December 23, 1993, when the written Global Settlement Agreement was signed, was it clear that a final agreement would actually be reached. The record contains no evidence of collusion, and establishes that the Global Settlement amount of $1.535 billion is well within the range of values the Court could properly approve as a fair and reasonable compromise. Very few objections to the settlement have been asserted, despite the extremely extensive notice campaign that was conducted in connection with it, at a cost of more than $22 million. It is highly unlikely that the Insurers or Fibreboard would have agreed to pay more than the amounts they agreed to pay in the Global Settlement, and the Court is satisfied that the Global Settlement is fair, reasonable and adequate.

## B. The Alternatives

It is appropriate in assessing the fairness of a class settlement to compare the risks and rewards of the Global Settlement with other possible outcomes. While there is no way to predict Fibreboard's future asbestos liability with any certainty, the Court can, based on the work of the experts and the views of counsel, assess the risks to the Class associated with each of the three basic "scenarios" that are presented by the record: the "Coverage Case scenario"; the "Trilateral Settlement scenario"; and the "Global Settlement scenario."

The Coverage Case scenario assumes that neither the Global Settlement nor the Trilateral Settlement receives final court approval and the Coverage Case is prosecuted to a conclusion in the California courts. Under this scenario, there is a significant risk that Fibreboard will be left either with no relevant insurance coverage at all or with coverage for only a small fraction of its total asbestos-related personal injury liability. In that event, Fibreboard would at best be able to meet only a small portion of its total liability to the Global Health Claimant Class, and that allowance of individual, "first come, first served" actions and adjudications with respect to Global Health Claimant Class

members' claims would rapidly exhaust all available assets and would leave the great bulk of the class uncompensated.

Even a total win in the Coverage Case would not guarantee that the Class would be fully compensated. There is a significant risk that Fibreboard's assignment settlement program may have entirely vitiated the Continental insurance, which would leave Fibreboard with only several hundred million dollars to cover both pre– and post–1959 claims. Any such outcome would guarantee, again, a massive shortfall in funds to compensate the Global Health Claimant Class—and therewith a substantial misallocation of Fibreboard's resources in the event individual actions and adjudications with respect to class member claims were permitted.

And even if Fibreboard were to win in the Coverage Case and Fibreboard's right to engage in the assignment settlement program were upheld so that Fibreboard had unlimited coverage for pre–1959 cases, the post–1959 cases, for which Fibreboard would be solely responsible, would sooner or later drive Fibreboard into bankruptcy. Transaction and indemnity costs would quickly consume Fibreboard's relatively modest assets. If Fibreboard were able to obtain the necessary court orders to effect the Pacific II Agreement, its demise might be delayed a few years, but it would not be averted. Fibreboard's bankruptcy would be a disaster for the post–1959s, and for the pre–1959s it would prove to be at least a major and expensive inconvenience.

In comparing the Coverage Case scenario with the Trilateral Settlement, the question is whether—from the standpoint of class members—it is preferable to (i) accept the known terms and benefits of the Trilateral Settlement (foremost of which is a $2 billion payment to Fibreboard from the Insurers); or (ii) gamble on both the outcome of the Coverage Case appeal and the possibility, regardless of the outcome of that appeal, that Fibreboard would be found to have vitiated its coverage under the Continental policy by its assignment settlement program. Given the extent of those risks, and—given Fibreboard's limited non-insurance assets—the devastating effect that such outcomes would

have on class members, the Trilateral Settlement is superior to no settlement at all.

Although the Trilateral Settlement scenario eliminates the risk of the Coverage Case, it is nevertheless problematical for the Global Health Claimant Class. There is a significant risk that the Trilateral Settlement (even augmented by Fibreboard's non-insurance assets) would leave a "late-comer" component of the Class without compensation in the event individual actions and adjudications with respect to class member claims were to be permitted.

Under the Global Settlement scenario, although there are substantial uncertainties involved, and although there is a significant risk—more than a mere possibility—that there will be a shortfall, all Class claims will more likely than not be paid at fair and appropriate values, although it is possible some claims may have to be deferred for some time pursuant to the spendthrift provisions of the Trust.

The funds provided under the Global Settlement are approximately equivalent to the funds available to resolve those claims under the Trilateral Settlement, after allowance is made for resolution of unsettled present claims and other items under the Trilateral Settlement. Under the Trilateral Settlement, however, Fibreboard's non-insurance assets are reachable by asbestos claimants. But this does not mean that more money will actually reach asbestos claimants under the Trilateral Settlement. Fibreboard's total sale value free of all its asbestos liabilities is only $235 million, which is considerably less than the likely savings in defense costs under the Global Settlement. In fact, taking into account the substantially lower transaction costs under the Global Settlement, the Global Settlement will provide substantially more money—at least hundreds of millions of dollars—that actually reaches class members for compensation of their claims than will be provided to them under the Trilateral Settlement. And although there is some risk under the Global Settlement that there will be insufficient funds to compensate all class members, under the Trilateral Settlement there is a substantial likelihood that the funds will be insufficient to compensate all

class members. Under the Global Settlement, the operation of the Trust will result in a far more cost-effective system that promotes the settlement of claims rather than the defense of them. If the Global Settlement is not ultimately approved, the only winner will be the asbestos litigation industry—lawyers on both sides, doctors, consultants, other expert witnesses, etc.—which has historically consumed as much as 63 cents of each asbestos litigation dollar. *See* Institute for Civil Justice *Annual Report,* April 1, 1990–March 31, 1991 (RAND).

Under the efficient claims administration and resolution procedures of the Trust, all transaction costs would likely constitute less than 15% of total Trust outlays. Under the Trilateral Settlement, there is a substantial likelihood that Fibreboard would spend a significant portion of the monies made available to it pursuant to the Trilateral Settlement on defense costs in an effort to achieve its litigation goals. Indeed, in the initial years under the Trilateral Settlement regime it is likely that Fibreboard would expend more of the Trilateral Settlement funds on defense costs than on indemnity payments to claimants.

Moreover, under the Global Settlement, claimants' attorneys' fees are limited to 25% of a claimant's recovery against the Trust—in contrast to the 33%–40% fees claimants' attorneys would often recover under the Trilateral Settlement—thus increasing the compensation that is provided to claimants rather than to their lawyers.

Additionally, under the Global Settlement, the operation of the Trust will result in a far more efficient and equitable system of administering claims and compensating claimants. A claim against the Trust will, on average, be processed and resolved much more quickly than a similar claim would be processed and resolved in the tort system under the Trilateral Settlement. As or more importantly, operation of the Trust under the Global Settlement will provide a fair method for compensating claimants that is more efficient and less burdensome than those claimants would experience under the tort system.

## CONCLUSION

In sum, the Global Settlement, like all of the settlements involved in this action, is fair, reasonable, and adequate, and inheres to the substantial benefit of its subject class. The Global Settlement is the product of hard-fought arms-length negotiations by competent counsel, and the amount of the settlement is easily within the range of values that the Court could approve. Under the facts of this case, a mandatory, non-opt-out class action is not only an appropriate vehicle to effect the settlement, it is the only way that the settlement could be accomplished. The Global Settlement is better both for the Class and for Fibreboard than the Trilateral Settlement, and both the Global Settlement and the Trilateral Settlement are far superior to the Coverage Case scenario. This Court sees no reason why the Global Settlement should not be approved.

The Court on this date also enters its Findings of Fact and Conclusions of Law and the various judgments that collectively reflect the Court's approval of the Global Settlement. What remains is for the Court to review the Report and Recommendation of the magistrate judge regarding attorneys' fees and any objections that may be lodged against it.

The Court would be remiss if it did not note that the attorneys for Fibreboard, Continental, Pacific, the Class, the Ortiz Intervenors and the Ad Litems have performed their tasks in the best tradition of this old and honored profession.