**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 19-1148**

———————————

DANIEL HERRERA; ZACHARY AIKEN; OMAR BASHI; KIMBERLEY BEYER; STEVEN BURLESON; KABIR BUHARI; EDGAR JULIAN CABRA; KAYLA CARMENIA; CHARLIE CARPENTER; SHERRY DUNCAN; BRENT FINNELL; PAMELA FREEMAN; CHARLES HORNACK; JAMES A. HOWE; TALECE HUNTER; EPHRAIM MOSELY; ANNABELLE PARDO; SUSAN PATROSKI; DAWN PATTERSON; MICHAEL PEREZ; KARINA RAHALL; SHANELL REID; JAMAL WILLIAMS,

　　　　　　　Objectors – Appellants,

and

ROBERT C. BARCHIESI, Individually and in a Representative capacity on behalf of a class of all persons similarly situated; LEJLA HADZIC, Individually and in a Representative capacity on behalf of a class of all persons similarly situated,

　　　　　　　Plaintiffs,

　　v.

CHARLOTTE SCHOOL OF LAW, LLC; INFILAW CORPORATION,

　　　　　　　Defendants – Appellees,

RAISSA LEVY; JAMES VILLANUEVA; SHANNA RIVERA; ANDRE MCCOY; 17CV26 LEVY PLAINTIFFS; LEAH ASH; 17CV39 ASH PLAINTIFFS; SPENCER KREBS; MORGAN SWITZER; DAVE WYATT; JACENTA MARIE PRICE; KRYSTAL HORSLEY; MARKISHA DOBSON; 17CV190 PLAINTIFFS,

　　　　　　　Consolidated Plaintiffs – Appellees,

INFILAW HOLDING, LLC; JAY CONISON; CHIDI OGENE; DONALD LIVELY,

Consolidated Defendants – Appellees,

and

STERLING PARTNERS; STERLING CAPITAL PARTNERS IV, LLC,

Defendants.

---

**No. 19-1161**

---

ROBERT C. BARCHIESI, Individually and in a Representative capacity on behalf of a class of all persons similarly situated; LEJLA HADZIC, Individually and in a Representative capacity on behalf of a class of all persons similarly situated,

Plaintiffs – Appellants,

REBECCA APPELBAUM; CAROLINE APRAHAMIAN; ERIN BOWMAN; BRIDGET CAMPBELL; ARIEL CARTER; KIA JOHNSON; VONDA JOHNSON; JESSICA HALL; ALECIA KING; BRYANT LAVENDER; HATTY MACON; NISHI PATEL; ALEX PETTY; LEROY RICHARDSON; KAYTLIN RUZICKA; JULIETA SMITH; CHRISTOPHER TABAKA; STACY TOWNSEND,

Objector – Appellants,

v.

CHARLOTTE SCHOOL OF LAW, LLC; INFILAW CORPORATION,

Defendants – Appellees,

RAISSA LEVY; JAMES VILLANUEVA; SHANNA RIVERA; ANDRE MCCOY; 17CV26 LEVY PLAINTIFFS; LEAH ASH; 17CV39 ASH PLAINTIFFS; SPENCER KREBS; MORGAN SWITZER; DAVE WYATT; JACENTA MARIE PRICE; KRYSTAL HORSLEY; MARKISHA DOBSON; 17CV190 PLAINTIFFS,

Consolidated Plaintiffs – Appellees,

INFILAW HOLDING, LLC; JAY CONISON; CHIDI OGENE; DONALD LIVELY,

Consolidated Defendants – Appellees,

2

and

STERLING PARTNERS; STERLING CAPITAL PARTNERS IV, LLC,

Defendants.

———————————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Graham C. Mullen, Senior District Judge.  (3:16-cv-00861-GCM)

———————————

Submitted:  March 19, 2020                                        Decided:  June 11, 2020

———————————

Before WILKINSON and KEENAN, Circuit Judges, and Rossie D. ALSTON, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

———————————

Affirmed by unpublished opinion.  Judge Alston wrote the opinion, in which Judge Wilkinson and Judge Keenan joined.

———————————

Gary K. Shipman, Kyle J. Nutt, Angelique Adams, SHIPMAN & WRIGHT, LLP, Wilmington, North Carolina; H. Forest Horne, John Alan Jones, Steven D. Corriveau, MARTIN & JONES, PLLC, Raleigh, North Carolina, for Barchiesi Appellants. Christopher R. Bagley, Gary W. Jackson, LAW OFFICES OF JAMES SCOTT FARRIN, Durham, North Carolina, for Herrera Appellants.  David E. Mills, Michael D. Hays, COOLEY LLP, Washington, D.C.; Robert T. Cahill, Reston, Virginia, for Appellees Charlotte School of Law, LLC, InfiLaw Corporation, InfiLaw Holding LLC, Jay Conison, Chidi Ogene, and Donald Lively.  Anthony J. Majestro, POWELL & MAJESTRO, PLLC, Charleston, West Virginia, for Appellees Spencer Krebs, et al.  Philip Bohrer, BOHRER BRADY LLC, Baton Rouge, Louisiana; Brian L. Kinsley, CRUMLEY ROBERTS, LLP, Greensboro, North Carolina, for Appellees Raissa Levy, et al.  Michael John Messinger, LAW OFFICES OF MICHAEL MESSINGER, PLLC, Charlotte, North Carolina, for Appellee Leah Ash.

———————————

Unpublished opinions are not binding precedent in this circuit.

ROSSIE D. ALSTON, Jr., District Judge:

The central question raised in this appeal is whether the district court abused its discretion in approving a limited fund class action settlement pursuant to Federal Rule of Civil Procedure 23(b)(1)(B) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). The dispute giving rise to the settlement centers around allegations concerning Charlotte School of Law, LLC's ("CSL") compliance with the American Bar Association's ("ABA") accreditation standards, related ABA directives to take remedial action, and representations or lack thereof concerning the same. Defendants[1] funded the settlement with $2,650,000.00, which was derived from the following two sources: a $2,500,000.00 portion of an insurance policy and a $150,000.00 institutional contribution. After a meticulous review, the district court ultimately approved the limited fund settlement.

As explained below, we conclude that the district court did not abuse its discretion in approving the limited fund settlement. We further find that the district court did not abuse its discretion by ultimately determining that the settlement was fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e), and in denying a motion for

---

[1] "Defendants" involved in the settlement include CSL, InfiLaw Corporation, InfiLaw Holding, LLC ("Holding") (collectively "entity-Defendants"), Chidi Ogene, Jay Conison, Don Lively, and Rick Inatome. J.A. 801. CSL and two other privately-owned, for-profit law schools were members of the Infilaw System. Each of these law schools and InfiLaw Corporation are owned by Holding. J.A. 518. Ogene was the President of CSL, Lively was the former President of CSL, and Conison was the Dean of CSL. Sterling Capital Partners, L.P., and Sterling Capital Partners GmbH & Co. KG were also initially Defendants.

4

discovery, largely concerning Defendants' ability to fund the settlement. Accordingly, we affirm the district court's decisions in full.

I.

A.

The ABA is the accrediting agency for programs awarding juris doctorates. *See generally*, 34 C.F.R. §§ 602. The particular entities involved in the accreditation process include the ABA's Council of the Section of Legal Education and Admissions to the Bar ("Council") and the Accreditation Committee of the Council ("Committee"). To obtain accreditation and remain in good standing, law schools must comply with the ABA's Standards and Rules of Procedure for Approval of Law Schools ("ABA Standards"). J.A. 519.[2]

CSL was established as a private, for-profit law school in 2006, and was accredited by the ABA in 2011. J.A. 518.

An ABA "site team" visited CSL in March 2014, conducted a Three Year Interval Evaluation, and then issued the resulting Inspection Report to CSL. J.A. 521-22. The Committee reviewed the Inspection Report as well as CSL's response and issued its decision on February 24, 2015. J.A. 522. In that decision, the Committee expressed that "it had reason to believe that" CSL was not in compliance with several ABA Standards and one ABA Interpretation. *Id*. The ABA Standards and Interpretation perceived to have been violated pertained to maintaining rigorous curriculum, ABA Standard 301(a);

---

[2] Citations to "J.A." refer to the joint appendix.

maintaining sound admission policies and practices, ABA Standard 501(a); not enrolling "high-risk students," ABA Standard 501(b); and finally, CSL's "academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program," ABA Interpretation 501-1. *Id.* Pertinent to these findings, the Committee requested additional information regarding CSL's compliance, which CSL submitted.

On February 3, 2016, the Committee issued a second determination, finding that CSL was "not in compliance" with the above ABA Standards and Interpretation. J.A. 523. The Committee again required that CSL supply additional information regarding compliance and advised that a hearing on the issuance of sanctions was forthcoming. *Id.* After that hearing, on July 21, 2016, the Committee issued a third decision determining that CSL remained noncompliant and that its noncompliance was both "substantial" and "persistent." J.A. 524. CSL was then required to disclose these findings to its students and the public. J.A. 525.

CSL appealed portions of this determination to the Council. *Id.* After hearing the appeal, on November 14, 2016, the Council issued a decision, finding that CSL's noncompliance was "substantial and . . . persistent," placing CSL on probation, and ordering public disclosure of the above findings. J.A. 526.

CSL allegedly did not make the required disclosures and made representations seemingly to the contrary of the ABA's findings through public statements, an email to students on November 16, 2016, and statements on CSL's website. J.A. 527-35.

6

Also, during the pendency of the accreditation investigation, CSL's application for recertification of its Program Participation Agreement was under review. This program enabled CSL students to apply for federal student loans. J.A. 519. On December 16, 2016, the Department of Education, the federal agency responsible for determining whether the participating school is eligible, denied CSL's application, citing in part the ABA determinations outlined above. J.A. 519.

CSL's license to operate granted by the University of North Carolina Board of Governors expired on August 10, 2017. J.A. 520. On August 15, 2017, the North Carolina Attorney General's Office ordered that CSL was no longer licensed to operate. *Id*. CSL closed that month.

Litigation commenced all over the state of North Carolina with the filing of lawsuits containing similar allegations regarding the circumstances outlined above in federal and state courts.

B.

1.

Three putative federal class action lawsuits were filed against Defendants; one in the Middle District of North Carolina and two in the Western District of North Carolina. Specifically, on December 22, 2016, *Krebs v. CSL*, No. 1:16-cv-01437-CCE-JEP (M.D.N.C.), was filed in the Middle District of North Carolina. J.A. 2593. On the same day, *Barchiesi v. CSL*, No. 3:16-cv-00861-GCM (W.D.N.C.), was filed in the Western District of North Carolina. J.A. 80. On January 19, 2017, *Levy v. CSL*, No. 3:17-cv-00026-GCM (W.D.N.C.), was also filed in the Western District of North Carolina. J.A. 802.

On April 10, 2017, *Krebs* was transferred from the Middle District of North Carolina to the Western District of North Carolina (hereinafter "district court"), No. 3:17-cv-00190-GCM. Accordingly, on October 13, 2017, the district court consolidated *Krebs*, *Barchiesi,* and *Levy* for discovery purposes. *Id.*

On December 28, 2016, Plaintiff Leah Ash filed suit in North Carolina Superior Court, *Ash v. CSL*, No. 16-CVS-22993, which was removed to the district court over her objection, *Ash v. CSL*, 3:17-cv-00039-GCM (W.D.N.C.). J.A. 802. Then, on November 14, 2017, the district court consolidated *Ash* with *Krebs*, *Barchiesi,* and *Levy*. *Id.*

Defendants moved to dismiss certain claims in these federal lawsuits prior to their consolidation. With the exception of the motions to dismiss filed in *Krebs* and *Ash*, each of the motions were granted in part and denied in part, and the district court ordered that a consolidated complaint be filed. J.A. 803. In *Krebs*, after permitting jurisdictional discovery, the district court granted the motion to dismiss for lack of personal jurisdiction as to Defendants Holding and Lively. *Id.*[3] The district court denied the motion to dismiss in *Ash* as moot given the filing of the consolidated complaint. *Id.*

Ultimately, on January 26, 2018, the *Barchiesi*, *Krebs*, *Levy,* and *Ash* Plaintiffs filed a consolidated complaint. J.A. 512-89. The following three claims were asserted: unfair or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 ("UDTPA"), fraud and fraudulent misrepresentation, and negligent misrepresentation. *Id.* On February 9, 2018,

---

[3] Defendants Holding and Lively remain as Defendants in the settlement agreement because "the dismissal does 'not end the action' as to them until judgment is entered." J.A. 803 (citing Fed. R. Civ. P. 54(b)).

Defendants CSL and InfiLaw Corporation answered by denying the allegations and asserting affirmative defenses. *Id.* Additionally, Defendants moved to dismiss Plaintiff Ash's individual claims as well as Defendants Chidi Ogene and Jay Conison. J.A. 804.

2.

Additional litigation ensued in North Carolina Superior Court with five lawsuits against certain Defendants. Specifically, *Herrera v. CSL*, No. 17-CVS-1965, was filed on January 31, 2017. *Herrera v. CSL*, No. 17-CVS-1965, 2018 WL 1902556, at *1 (N.C. Super. Ct. Apr. 20, 2018). *Robertson v. CSL*, No. 17-CVS-4265, was filed on March 10, 2017. *Id. Moseley v. CSL*, No. 17-CVS-5870, was filed on March 28, 2017. *Id. Merritt v. CSL*, No. 17-CVS-6749, was filed on April 13, 2017. *Id.* And finally, *Frisby v. CSL*, No. 17-CVS-7851, was filed on May 1, 2017. *Id.* All were deemed mandatory complex business cases under North Carolina state law. *Id.* at *2.

On June 16, 2017, Defendants moved to dismiss the five lawsuits pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. *Herrera*, 2018 WL 1902556, at *2. Defendants Holding, Lively, and Inatome also moved for dismissal pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure. *Id.* Defendants Sterling Capital Partners, L.P., and Sterling Capital Partners GmbH & Co. KG moved for dismissal pursuant to Rules 12(b)(2) and 12(b)(6) of the North Carolina Rules of Civil Procedure. *Id.*

On June 21, 2017, the North Carolina Superior Court consolidated these lawsuits under *Herrera*. J.A. 803. The North Carolina Superior Court also ordered that subsequently filed related actions be assigned to that court and then stayed those related

9

actions. *Id.* As a result, more than 90 lawsuits involving over 160 Plaintiffs are pending before the North Carolina Superior Court. *Id.*

On February 14, 2018, the North Carolina Superior Court dismissed all claims against Sterling Capital Partners, L.P., and Sterling Capital Partners GmbH & Co. KG for lack of personal jurisdiction. *Id.* at *3.

On April 20, 2018, the North Carolina Superior Court granted in part and denied in part the motions to dismiss. *Id.* at *2-18. Thus, the remaining claims included fraud, intentional misrepresentation, negligent misrepresentation, and unfair or deceptive trade practices. *Id.* at *18. The North Carolina Superior Court permitted the Plaintiffs to file an amended consolidated complaint pursuant to Rule 9(b) within thirty days. *Id.* at *18-19.

C.

From April 19, 2018, to April 20, 2018, the Plaintiffs in the above-referenced federal and state lawsuits and their counsel participated in a mediation conducted by professional mediator, Hunter Hughes. J.A. 805. As a result, Defendants and the Plaintiffs in *Krebs* and *Levy*, as well as Plaintiff Leah Ash (collectively "Settling Parties"), executed a Memorandum of Understanding with the *Barchiesi* Plaintiffs. *Id.* In the Memorandum of Understanding, the Settling Parties agreed to "engage[] [in] settlement discovery and due diligence, and analyze[] the legal and factual issues relevant to settlement." *Id.* The inquiry largely concerned Defendants' ability to pay a judgment. *Id.* Eventually, a settlement agreement was reached. *Id.*

As noted in the settlement agreement, this was to be a limited fund, non-opt-out settlement pursuant to Federal Rule of Civil Procedure 23(b)(1)(B). *Id.* The settlement

10

class was defined as those "who enrolled in, attended, or paid tuition or fees to CSL between September 1, 2013 through and including August 15, 2017." J.A. 806. Additionally, Defendants agreed to fund the settlement with $2,500,000.00 of a $5,000,000.00 insurance policy and a $150,000.00 institutional contribution, totaling $2,650,000.00. *Id.*

On September 11, 2018, the Settling Parties jointly moved for preliminary approval of the limited fund settlement and for preliminary certification of the settlement class ("joint motion"). J.A. 795-801.

The next day, the district court granted the joint motion.

On October 9, 2018, the *Barchiesi* Plaintiffs requested additional discovery from the Settling Parties on issues surrounding the limited fund. After that request was refused, the *Barchiesi* Plaintiffs filed a motion with the district court requesting the same. J.A. 1379. The district court took the matter under advisement until the fairness hearing. J.A. 2365. Additionally, several of the *Barchiesi* and *Herrera* Plaintiffs filed notices of objection to the settlement agreement. J.A. 1418-1979.

The fairness hearing took place on January 9 and 10, 2019. J.A. 2370. After considering argument, the district court denied the *Barchiesi* Plaintiffs' discovery motion relating to Defendants' ability to fund the settlement. J.A. 2386. The district court then heard unsworn statements made by certain *Barchiesi* and *Herrera* Plaintiffs regarding their respective objections to the settlement agreement.

Experts then testified with respect to the "limited fund." J.A. 2402. The expert for the Settling Parties, as well as the entity-Defendants' Chief Financial Officer ("CFO"),

11

Scott Thompson, advised that he supplemented documentation previously filed concerning the entity-Defendants' finances. Those included income statements and balance sheets. J.A. 2410. Thompson explained that the Defendants adequately substantiated that the $2,650,000.00 figure was all that Defendants could pay to fund the settlement. J.A. 2405. Thompson advised that the two sources available to fund the settlement included $2,500,000.00 of a $5,000,000.00 insurance policy and a $150,000.00 institutional contribution, which was not presently on hand, but would be created through other means, such as reductions in force. J.A. 2405-09. In assessing Defendants' financial state, Thompson noted that Defendants' liabilities exceeded their assets. J.A. 2413-14. Thompson also stated that a tax refund was used for critical operating expenses necessary to sustain the entity-Defendants' survival and advised that lawsuits were filed against the ABA for the same reason. J.A. 2415. The expert for the *Barchiesi* Plaintiffs and *Herrera* Plaintiffs, Edward Bowers, disagreed with Defendants' representations and supporting documentation concerning their ability to fund the settlement. J.A. 2456-79. Both experts were cross-examined.

The next day, the district court approved the settlement, carefully proceeding through the factors articulated in Federal Rule of Civil Procedure 23(b)(1)(B), *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and Federal Rule of Civil Procedure 23(e). J.A. 2486-2550. The district court entered an order on January 16, 2019, approving the settlement. J.A. 2553-2558.

The *Barchiesi* Plaintiffs (hereinafter "*Barchiesi* Objectors") and *Herrera* Plaintiffs (collectively "Objectors"), timely noticed separate appeals. J.A. 2566-2572. The

12

Objectors appealed the district court's final order approving the settlement as well as the district court's final judgment. *Id.* The *Barchiesi* Objectors also appealed the district court's denial of their discovery motion. *Id.*

II.

This case presents three main claims of error. First, the Objectors argue that the district court erred when it approved the limited fund class action settlement pursuant to Federal Rule of Civil Procedure 23(b)(1)(B) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Next, the Objectors contend that the district court erred in approving the settlement as fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e). And finally, the *Barchiesi* Objectors argue that the district court erred in denying its discovery motion. We address each claim of error in turn.

A.

"In drafting Rule 23(b), the Advisory Committee sought to catalogue in 'functional' terms 'those recurrent life patterns which call for mass litigation through representative parties.'" *Ortiz*, 527 U.S. at 833 (citing Kaplan, A Prefatory Note, 10 B.V. Ind. & Com. L. Rev. 497 (1969)). Reading Federal Rule of Civil Procedure 23(b)(1)(B) with subsection (c)(2)

> provides for certification of a class whose members have no right to withdraw, when "the prosecution of separate actions . . . would create a risk" of "adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."

13

*Ortiz*, 527 U.S. at 833 (quoting Fed. R. Civ. P. 23(b)(1)(B)). A species of such lawsuits includes one wherein property requires distribution or management. *Id*. at 834 (quoting J. Moore & J. Friedman, 2 Federal Practice 2240 (1938)). A subset of those lawsuits includes the "limited fund" class action, wherein "'claims . . . made by numerous persons against a fund insufficient to satisfy all claims'" are aggregated. *Id*. (quoting Advisory Committee's Notes on Fed. R. Civ. Pro. 23, 28 U.S.C. App., p. 697)).

In *Ortiz*, the Supreme Court of the United States set forth a "set of conditions to justify binding absent members of a class under Rule 23(b)(1)(B)" in the context of limited fund class actions. *Id*. at 838. The Supreme Court opined that these conditions should be treated as "presumptively necessary, and not merely sufficient." *Id*. at 838, 842-48. Those conditions include: 1) "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims," 2) "the whole of the inadequate fund was to be devoted to the overwhelming claims," and 3) "the claimants identified by a common theory of recovery were treated equitably among themselves." *Id*. at 838-39.

With respect to the first condition, the Supreme Court noted that the notion underlying this condition was "insufficiency, which alone justified the limit on an early feast to avoid later famine." *Id*. at 838 (citing *Guffanti v. Nat'l Sur. Co.*, 196 N.Y. 452, 457, 90 N.E. 174, 176 (N.Y. 1909) and *Nat'l Sur. Co. v. Graves*, 211 Ala. 533, 534, 101 So. 190, 190 (Ala. 1924)). "[T]he settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund, with support in findings of fact following a proceeding in which the evidence is

14

subject to challenge." *Id*. at 849 (citing *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 306 (6th Cir. 1984)). The rationale underlying the second condition concerns "ensur[ing] that the class as a whole was given the best deal[, and that the limited fund] did not give a defendant a better deal than *seriatim* litigation." *Id*. at 839. With respect to the third condition, the Supreme Court observed that the cases "assume that the class will comprise [of] everyone who might state a claim on a single or repeated set of facts, invoking a common theory of recovery, to be satisfied from the limited fund as the source of payment." *Id*. "In these cases[,] the hope of recovery was limited. . . . Once the represented classes were so identified, there was no question of omitting anyone whose claim shared the common theory of liability and would contribute to the calculated shortfall of recovery." *Id*. at 840 (citing *Nashville & Decatur R.R. Co. v. Orr*, 18 Wall. 471, 474 (1873)). And "[o]nce all similar claims were brought directly or by representation before the court, these antecedents of the mandatory class action presented straightforward models of equitable treatment, with the simple equity of a pro rata distribution providing the required fairness." *Id*. at 840-41 (citing 1 J. Pomeroy, Equity Jurisprudence § 407, pp. 764-65 (4th ed. 1918)).

With these benchmarks, we review the district court's approval of the limited fund settlement under an abuse of discretion standard. *Sharp Farms v. Speaks*, 917 F.3d 276, 299 (4th Cir. 2019) (quoting *Berry v. Shulman*, 807 F.3d 600, 614 (4th Cir. 2015)).

1.

In reviewing the determinations made regarding the first condition, we first reject the Objectors' argument that a limited fund settlement is not appropriate in this case.

15

The district court distinguished the instant matter from *Ortiz*. The district court observed that one concern the Supreme Court raised in *Ortiz* was the existence of unliquidated tort claims. The district court further explained that in *Ortiz*, a subset of claimants were exposed to asbestos but had not yet developed a related malignancy or disease. J.A. 2542. Thus, the district court opined, that the extent of those claimants' injuries was unknown and unascertainable. *Id.* The district court went on to observe that, in the post-*Ortiz* era, federal courts have approved limited fund class action settlements involving tort claims. *Id.* (citing *Stott v. Capital Fin. Servs.*, 277 F.R.D. 316, 328-29 (N.D. Tex. 2011) (noting that although the class action involved claims of fraud, the district court was able to reach a "sufficiently reliable conclusion regarding the probable total of the aggregated liquid damages")).

We recognize that in *Ortiz*, the Supreme Court noted that applying "Rule 23(b)(1)(B) to a fund and plan purporting to liquidate actual and potential tort claims is subject to question." *Ortiz*, 527 U.S. at 864. And, ultimately, the Supreme Court found a Rule 23(b)(1)(B) application inappropriate in *Ortiz*. *Id.* However, in assessing the first condition set forth in *Ortiz*, the Supreme Court commented that although the *Ortiz* district court essentially found that the damages were unliquidated and unascertainable for the subset of plaintiffs previously described, the *Ortiz* district court could have used experience with prior similar cases as a guide to approximate the damages figure. *Id.* at 850 (citing *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 528 (E.D. Tex. 1995)).

In determining whether the aggregated liquidated claims were set at their maximums, in the instant case, the district court discerned that the damages requested

16

largely amounted to reimbursements for tuition, payment, and fees. J.A. 2543. The district court identified the class and then set forth a simple formula to calculate the damages figure: "one must multiply the annual cost of tuition and fees, times two; the number of students, times three; the number of years in attendance." J.A. 2543. The district court then "[p]erform[ed] that calculation for [one] year at average costs [which yielded] a multi-hundred dollars of millions of dollars in damages." J.A. 2543. The district court also advised that the Settling Parties approximated that the damages figure was $105,000,000.00 prior to trebling the actual damages and adding attorneys' fees sought under the UDTPA. J.A. 2543.

In scrutinizing whether the limited fund was set at its maximum, which the Objectors contend that it was not, the district court found there were only two sources to fund the settlement. Those sources included $2,500,000.00 of an insurance policy and a $150,000.00 direct institutional contribution. J.A. 2544. In so finding, the district court referenced the "ample evidence" before it, including the submissions of the Settling Parties and the testimony of their expert, Scott Thompson. J.A. 2543. The district court emphasized that Defendants' liabilities "far exceed their assets." J.A. 2544. With respect to the contention that these figures were a result of negotiation, the district court found that "[n]egotiation is not precluded in these circumstances." J.A. 2544.

With regard to Defendants' finances generally, it is significant to note that other entities under Defendants' control, including two other for-profit law schools, were not profitable. Further, Defendants explained that the tax refund was used for critical business expenses and explained that hundreds of thousands of dollars were expended on lawsuits

17

against the ABA. Thompson testified that the lawsuits were undertaken for the survival of Defendants' businesses.

Turning to Defendants' funding of the settlement, Thompson clarified that the most that could be paid out of the $5,000,000.00 insurance policy was $2,500,000.00. Thompson explained that although invoices were pending, Defendants directed the insurance company to stop paying on those invoices after reaching $2,500,000.00 in order to preserve the remaining balance to fund the settlement.

Additionally, Thompson testified extensively with respect to the $150,000.00 institutional contribution. At the mediation, the mediator shuttled between the parties several times. Defendants then advised that $150,000.00 was the most that could be contributed to the settlement beyond the portion of the insurance policy previously discussed. Defendants indicated that this sum was not on hand but would be created by other means, such as reductions in force. Ultimately, when asked if other sources were available to fund the settlement, Thompson explained that there were none, and that, as CFO, this was the most that Defendants could contribute to the settlement. Unlike the *Ortiz* district court, that the Supreme Court criticized for "uncritical[ly] adopt[ing] . . . figures agreed upon by the parties in defining the limits of the fund," the district court in the instant matter copiously and carefully sifted through the evidence presented and made detailed findings on the record. *Id*. at 848.

The district court also established the inadequacy of the fund when it observed that the damages claims exceeded the limited fund, set at $2,650,000.00, by "roughly 40 times," which was "a rather enormous disparity." J.A. 2543.

18

The district court did not abuse its discretion in making these findings, which were well-supported by the record.

2.

The Objectors then contest the district court's findings with respect to the second condition, which they frame as an alternative argument. *See* Appellants' Op. Br. 37. When advancing this argument, the Objectors contend that Defendants fare better under the settlement agreement as Defendants are able to "keep their businesses, with $10,000,000[.00] in annual revenue, free of all [c]lass claims, for the meager payment of $150,000[.00]." Appellants' Op. Br. 27.

Importantly, the district court found that there was no dispute that the entirety of the limited fund, except for attorneys' fees and costs, would be devoted to payment of these claims. J.A. 2544. We further note that the Objectors' argument is unavailing considering that the Defendants' liabilities outweigh their assets. Moreover, the Objectors' argument fails to consider the payment from the insurance policy. Further, if additional litigation were to commence, there would be no funds left for the remaining Plaintiffs. *Ortiz*, 527 U.S. at 839.

The district court did not abuse its discretion in so finding.

3.

With respect to the third condition, we disagree with the Objectors' contentions that the class is both underinclusive and overinclusive.

The district court noted that the class included "all individuals who enrolled in, and attended, or paid tuition or fees to CSL from September 1, 2013, to August 15, 2017." J.A.

19

2544. Accordingly, Plaintiffs who were party to the federal consolidated actions, as well as the *Herrera* Plaintiffs, were encompassed by the class. J.A. 2544. When presented with the suggestion that the class was overinclusive, the district court dismissed it as meritless. J.A. 2544-45. We note that the class members advanced similar claims. Additionally, the mechanism developed to distribute the limited fund reflects the relative value of the various claims alleged, *see infra* p. 20. This conclusion cannot be considered an abuse of discretion.

With respect to whether the members of the class were equitably treated, which the Objectors argue they were not, the district court noted that a Claims Administrator would distribute the limited fund to class members according to a mechanism involving "tiers and point allocations" "based upon criteria reflecting the strength of the student claims and the magnitude of their alleged damages." J.A. 2545. The limited fund would then be distributed by the Claims Administrator to class members "proportionately to the point allocations," awarding the most to those with the strongest case who suffered the greatest loss. *Id.* The district court noted that the settlement mechanism was a result of "detailed and hard-fought negotiations" and accounted for other available sources of relief as well as complexities in individual cases. The district court found that the mechanism had a "reasonable, rational basis" and found it was fair. J.A. 2545-46.

We find the district court's assessment sound. The mechanism developed for distributing the fund is proportionate to what each member of the class suffered, awarding those who suffered more. . . a greater share.

20

Ultimately, the district court analyzed the factors set forth in *Ortiz* with painstaking care.  The district court did not abuse its discretion in any regard.

B.

We also disagree with the Objectors' argument that the district court abused its discretion in approving the settlement as fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e).

Before parties settle a class action lawsuit, the parties are required to seek the approval of the district court.  Fed. R. Civ. P. 23(e).  Before the district court approves the settlement, that court must conduct a hearing and find that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).[4]  In determining whether the settlement is fair, this Court has identified the following factors the district court may

---

[4] Federal Rule of Civil Procedure 23(e)(2) has been amended and now sets forth factors for the district court to assess in evaluating fairness, reasonableness, and adequacy. Recognizing that, this Court continues to apply its own standards as they "almost completely overlap with the new Rule 23(e)(2) factors," rendering the analysis the same. *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 952 F.3d 471, 474, n.8 (4th Cir. 2020).  The factors set forth in Rule 23(e)(2) include

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

consider, which the district court followed: "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation." *In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020) [hereinafter *In re Lumber Liquidators*] (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991)).

In determining whether the settlement is adequate, the following factors set forth by this Court guided the district court's analysis:

> (1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement.

J.A. 2548 (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159).

Moreover, as we previously opined, we "afford[] the district court's decision 'substantial deference,' reversing only 'upon a clear showing that the district court abused its discretion in approving the settlement.'" *Sharp Farms v. Speaks*, 917 F.3d 276, 299 (4th Cir. 2019) (quoting *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015)).

1.

We are satisfied that the district court did not abuse its discretion in finding that the settlement was fair. The district court noted that the settlement was approved after approximately "a year and a half of litigation involving significant motions practice and

22

discovery." J.A. 2546; *see In re Lumber Liquidators*, 952 F.3d at 484 (citing *Berry*, 807 F.3d at 614 (finding that a settlement was fair after noting that "extensive discovery" took place prior to its approval)). The district court observed that engaging in such motions practice and discovery over that length of time enabled the parties to "develop their negotiations positions." J.A. 2546. Additionally, the district court found that negotiations occurred at an arm's length as the two-day mediation was led by "an experienced class action mediator." J.A. 2547; *see In re Lumber Liquidators*, 952 F.3d at 484-85 (discerning that the point of the fairness analysis is to determine whether a settlement was a product of "good-faith bargaining at arm's length, without collusion").

Further, the declarations filed in the case demonstrated that class counsel was experienced in handling class action litigation as well as such suits involving school closures. *See In re Lumber Liquidators*, 952 F.3d at 485.

For these reasons, the district court did not abuse its discretion in determining that the settlement was fair.

2.

We also find that the district court did not abuse its discretion in finding that the settlement was adequate. The district court found that the factors established by this Court weighed in favor of settlement and highlighted factors three, four, and five. J.A. 2548.

Regarding the third factor, the district court fittingly noted that ensuing litigation "would quickly deplete the limited settlement fund, thereby dramatically reducing any potential recovery." J.A. 2548; *see In re Lumber Liquidators*, 952 F.3d at 485 (citing *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005) (affirming

23

a district court's approval of a settlement wherein the district court found that the suit would likely proceed for years and cause the "expenditure of millions of dollars")).

With respect to the fourth factor, the district court considered the filings, including those that were supplemented, as well as what occurred at the fairness hearing. The district court reiterated that "Defendants' liabilities far exceed their assets." J.A. 2548. The district court's findings related to approving the limited fund settlement further support the district court's determination that the settlement was adequate, *infra* pp. 15-20.

Finally, in consideration of the fifth factor, the district court also indicated that "the vast majority" of the class approved of the settlement, noting that only approximately four percent of the class filed objections. J.A. 2548; *see In re Lumber Liquidators*, 952 F.3d at 485-86 (explaining that a finding that 0.05% opted out of the settlement and about 0.0006% objected to the settlement supported the determination that the settlement was adequate).

Additionally, in the district court's discussion on whether the settlement was fair, reasonable, and adequate, the district court considered the "complexity of Plaintiffs' theory of liability" as well as "the arguments raised by Defendants in its pleadings that could potentially preclude or reduce the recovery" and observed that the settlement terms provided "substantial and adequate value" to the class. J.A. 2554.

Accordingly, we cannot find that the district court abused its discretion in approving the settlement as fair, reasonable, and adequate.

## C.

We also disagree with the *Barchiesi* Objectors that the district court abused its discretion when denying the discovery motion.

24

"We review the district court's discovery and evidentiary rulings for abuse of discretion." *Jordan v. South Carolina Dep't of Transp.*, 797 Fed. App'x. 101, 102 (4th Cir. 2020) (citing *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 189 (4th Cir. 2017) and Fed. R. Civ. P. 61).

When denying the *Barchiesi* Objectors' discovery motion, the district court applied a very stringent standard. The district court first noted that the purpose of settlement-related discovery "is to ensure that the [district court] has sufficient information" to enable it to approve the settlement. J.A. 2385 (quoting *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1337 (S.D. Fla. 2011)). The district court further noted that settlement-related discovery often "delay[s] settlement, introduce[s] uncertainty, and might be undertaken primarily to justify an award of attorneys fee[s] to objector's counsel," thereby justifying a higher standard. *Id*. (citing The Manual for Complex Litigation, § 21.643 (4th ed.)). The district court advised that in a limited fund settlement context, these "concerns are heightened." *Id*. The district court then applied the standard set forth in *Int'l Union, United Auto., Aerospace, and Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007). Based on that case, the district court found that to obtain settlement-related discovery, a movant is required to demonstrate a "colorable claim that the settlement should not be approved" and that "existing discovery is insufficient or not truly adversarial." *Id*. at 2385-84. The district court then held that the *Barchiesi* Objectors failed to meet that standard.

25

Today, we do not decide whether a more stringent standard must be applied to settlement-related discovery motions. We only decide whether the district court abused its discretion in denying the discovery motion at issue.

The basis of the discovery motion pertained to the limited fund. At the fairness hearing, the Court heard argument on the discovery motion and subsequently denied it, finding that the terms of the extent of discovery were "negotiated vigorously," that Defendants complied with those terms, and that as a result, "extensive document discovery" had occurred. J.A. 2386.

These findings were amply supported by the record and were well within the district court's discretion.

## III.

For the reasons set forth above, we find that the district court did not abuse its discretion in approving the limited fund settlement pursuant to Federal Rule of Civil Procedure 23(b)(1)(B) and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), in finding that the settlement was fair, reasonable, and adequate pursuant to Federal Rule of Civil Procedure 23(e), and in denying the discovery motion. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*